STATE ex rel. DICKGRABER, Respondent, v. SHERIDAN, TREASURER, et al., Appellants.

No. 9277.
Submitted March 2, 1953. Decided March 5, 1953.
254 Pac. (2d) 390.

448

Arnold H. Olsen, Atty. Gen., William F. Crowley, H. M. Brickett, Asst. Attys. Gen., for appellants.

Wellington D. Rankin and Arthur P. Acher, Helena, for respondent.

Mr. Olsen, Mr. Crowley, Mr. Rankin and Mr. Acher argued orally.

MR. CHIEF JUSTICE ADAIR:

In the calendar year 1952 the state board of land commissioners acting pursuant to the laws of the state of Montana, R. C. M. 1947, secs. 81-103 and 81-1701 et seq., and the regulations, customs and practices of the board, from time to time, advertised

various separate tracts of particularly described public school lands as being open for oil and gas leasing through oral competitive bidding at public auction. These lands had been donated and granted to the state by the federal government for the support of the common schools pursuant to the provisions of the Enabling Act approved February 22, 1889, 25 Stat. 676.

As a result of the auction sales so held in 1952, the state received in cash from the successful bidders the aggregate sum of $5,790,424.32, all of which was treated and handled as money rents received from the leasing of the above school lands and five per cent of such amount has been placed in the permanent school fund as is required by sec. 5 of Article XI of the Constitution of Montana.

The balance of cash so received from the successful bidders in the sum of $5,500,903.10 and representing 95% of all the moneys so received has been placed in the common school interest and income fund to be apportioned and distributed annually to the several school districts in the state as provided in Article XI, sec. 5 of the Constitution of Montana.

The instant action was brought in the district court of Lewis and Clark County by a taxpayer. After trial had, a judgment and order was entered granting a permanent injunction enjoining the appellants, Charles L. Sheridan as state treasurer and John J. Holmes, state auditor, from disbursing to the respective county treasurers throughout the state of Montana the $5,500,-903.10 so received from the successful bidders in consideration of the oil and gas leases that had been executed and delivered to each. This is an appeal from the judgment and order so entered in the district court.

Each lease so executed and delivered by the board to each successful bidder was on a printed form, specially prepared by the state to conform with the various rules and regulations prescribed by law and governing the leasing of its school lands, such printed form being known as "State of Montana Oil and Gas Lease," Form No. 3. The printed form, in part, reads:

450

OIL AND GAS LEASE
3681-52

THIS INDENTURE OF LEASE, Made and entered into by and between the State of Montana, by and through its lawfully qualified and acting State Board of Land Commissioners, hereinafter referred to as lessor, and the person, company or corporation herein named, hereinafter referred to as lessee, under and pursuant to the terms and provisions of Chapter 175 of the Political Code of the Revised Codes of Montana, 1935, and all acts amendatory thereof and supplementary thereto, WITNESSETH:

The said lessor in consideration of the annual rentals hereinafter stated, the receipt of which for the first year of this lease is hereby acknowledged, the royalties to be paid, and the covenants to be kept and performed by the lessee, hereinafter set forth, has granted, demised, leased, and let, and by these presents does grant, demise, lease, and let unto the said lessee, for the purpose of mining and operating for oil and gas, and of laying pipe lines, building tanks, power stations, and other structures thereon necessary in order to produce, save, care for, dispose of and remove the said products, all the lands herein described, as follows:

Date this lease takes effect: *November 26, 1952*
Name of Lessee: *Robert B. Smith*
Address: *P. O. Box 749, Madill, Oklahoma*
Land Located in *McCone County*
Description of land: *All Sec. 36. Twp. 19 N. Rge 47 East* County *McCone County*
Total number of acres 640, more or less, belonging to School Grant.

*First year $3360.00*
Annual rental, payable each year in advance,
*Thereafter $480.00*

TO HAVE AND TO HOLD the said premises, with the appurtenances, unto said lessee and successors, legal representatives or assigns, for the term of TEN YEARS and as long thereafter as oil or gas in commercial quantities shall be produced from

the said land, not exceeding, however, the total period of TWENTY YEARS from the date this lease takes effect, SUBJECT to all of the terms and conditions herein set forth.

IT IS MUTUALLY UNDERSTOOD, AGREED AND COVENANTED BY AND BETWEEN THE PARTIES TO THIS LEASE AS FOLLOWS: * * *

2. The lessee shall pay to the lessor an annual money rental in the amount hereinabove stated being not less than Seventy-five cents (75¢) for each acre of land held under this lease from year to year, PROVIDED, however, that the amount of such money rental so payable shall in no case be less than Fifty Dollars ($50.00) per annum and such rental shall be due and payable thirty days before the beginning of each subsequent year of this lease.

3. The lessee shall pay in money or in kind to the lessor at its option as hereinafter provided during the full term of this lease in addition to the annual money rental hereinabove stated, a royalty on the average production of the oil from the producing wells under this lease for each calendar month as follows:

A. On that portion of the average production of oil or casing-head gasoline for each producing well not exceeding 3,000 barrels for the calendar month, twelve and one-half per centum (12½%).

B. On that portion of the average production of oil or casing-head gasoline for each producing well exceeding 3,000 barrels but not exceeding 6,000 barrels for the calendar month, seventeen and one-half percentum (17½%).

C. On that portion of the average production of oil or casing-head gasoline for each producing well exceeding 6,000 barrels for the calendar month, twenty-five percentum (25%).

4. The lessee shall also pay in money or in kind to the said lessor at its option as hereinafter provided during the full term of this lease a royalty on the gas produced from the wells under this lease whether the said wells produce oil and gas or gas alone, a flat royalty of twelve and one-half percentum (12½%).

5. All wells under this lease shall be so drilled, maintained and operated as to produce the maximum amount of oil which can be secured without injury to the wells and the aforesaid royalties shall be based and calculated on such full production of oil; but the lessee shall have the right to apply to the State Board of Land Commissioners for permission to curtail production as provided in paragraph 12 of this lease. All royalties shall be calculated upon the total amount produced and saved under this lease exclusive of oil or gas used for light, fuel or operating purposes in connection with the work on the lands under the lease.

6. The lessee shall pay to the lessor in cash for such royalty oil and gas at the rate of the posted field price therefor existing on the day such oil or gas was run into any pipe line or storage tank to the credit of the lessee plus any bonus or other increase in price actually paid or agreed to be paid to the lessee; provided, however, that at the option of the lessor exercised not oftener than once every thirty days by notice in writing the lessee shall deliver the State's royalty oil or gas free of cost or deductions into the pipe line to which the wells of the lessee may be connected or into any storage designated by the State and connected with such wells. The lessee shall not be required to furnish storage for the State's royalty oil for more than thirty days following the date of production thereof when a market therefor is available.

7. In all cases where there is no posted field price for oil or gas produced under this lease, the payments in cash for the royalties payable hereunder shall never be less than the price actually obtained therefor or the reasonable market value thereof at the wells produced at the time of the sale of the same; and if the price obtained appears to the State Board of Land Commissioners to be less than the actual reasonable market value, then such actual reasonable market value shall be fixed and determined by mutual agreement between the lessee and the said Board. This lease is granted upon the express condition

that the value of the State's royalty gas shall not at any time be figured at less than five (5¢) cents per 1,000 cubic feet.

\* \* \* \* \* \* \* \* \* \* \*

18. The lessee may assign this lease either in whole or as to any regular subdivision thereof, embracing not less than 40 acres, to any qualified assignee, providing that such assignment shall not be binding upon the State until it has been filed in the office of the Commissioner of State Lands and Investments accompanied by the required fees and bond together with such proof of qualifications of the assignee as may be required by the State Board of Land Commissioners and has been approved by such Board.

19. The said lessee shall have the right at the termination of any rental year, by giving at least 30 days previous notice in writing to the Commissioner of State Lands and Investments to surrender and relinquish this lease and thereupon be discharged from any obligation not therefore accrued.

\* \* \* \* \* \* \* \* \* \* \*

The first paragraph of section 11 of the Enabling Act as amended, in part, provides: "That all lands granted by this act shall be disposed of only at public sale after advertising—tillable lands capable of producing agricultural crops for not less than ten dollars ($10.00) per acre, and lands principally valuable for grazing purposes for not less than five dollars ($5.00) per acre. \* \* \*" Thus did Congress place a minimum price per acre which the lands must bring when and if sold.

The second paragraph of section 11 of the Enabling Act as amended provides: "The said lands may be leased under such regulations as the legislature may prescribe; but leases for grazing and agricultural purposes shall not be for a term longer than ten (10) years; mineral leases, including leases for exploration for oil and gas and the extraction thereof, for a term not longer than twenty (20) years; and leases for development of hydro-electric power for a term not longer than fifty (50) years." Thus did Congress authorize a leasing of the lands

"including leases for exploration for oil and gas and the extraction thereof".

Section 3 of Chapter 108, Laws of 1927, p. 363, now R. C. M. 1947, sec. 81-1703, in part, provides: "The minimum annual money rentals to be paid to the state for oil and gas leases under the provisions of this act shall be seventy-five cents (75¢) for each acre of land leased; provided, however, that such rental shall in no case be less than fifty dollars ($50.00) per annum." Thus has the legislature prescribed a minimum annual money rental per acre (75¢) and also a minimum total annual rental per lease ($50.00). However, the legislature has prescribed no maximum annual money rental per acre nor has it prescribed any maximum annual total rental per lease. Whether the bidder acquire his lease for a bid of 75¢ per acre or for a bid of $420 per acre the character of the transaction remains the same and cash consideration paid in advance for one year's rent is nevertheless rental money.

Under the provisions of section 3 of Chapter 108, Laws of 1927, one may bid an annual rental, payable in advance, of $1.00 for each acre of a forty-acre tract, being 25¢ per acre higher than the 75¢ per acre minimum set by law, but the board would be required to reject such bid and decline to issue a lease because the total annual rental would be but $40 and the law says "that such rental shall in no case be less than fifty dollars ($50.00) per annum."

Section 4 of Chapter 108, Laws of 1927, p. 364, now R. C. M. 1947, sec. 81-1704, as amended by Chapter 61, Laws of 1951, pp. 108-109, provides: "In every oil and gas lease granted by the state there shall be reserved to the state as consideration therefor, *in addition to the rentals as hereinbefore provided,* a royalty in all oil and gas produced and saved from all lands covered thereby, and not used for light, fuel, and operation purposes on the leased premises, which shall be equivalent to the full market value, as ascertained by the state board of land commissioners at the date of such lease, of the estate or interest of the state in the lands and oil and gas deposits disposed of

under such lease; provided that such royalty reservation shall be twelve and one-half per centum (12½%) on gas, and twelve and one-half per centum (12½%) on that portion of the average production of oil or casing-head gasoline for each producing well not exceeding 3000 barrels for the calendar month. Such lease shall provide for the rendering of payment of such royalty in the following manner and upon the following terms:

" 'The lessee shall pay to the state, in cash, for all oil and gas royalty reserved, *the posted field price existing on the day such oil or gas is run into any pipe line or storage tank to the credit of the lessee, plus any bonus actually paid, or agreed to be paid, to the lessee, for such oil or gas;* or, at the option of the state, exercised in writing by the State Board of Land Commissioners not oftener than every thirty (30) days, the lessee shall deliver the state's royalty oil or gas free of cost or deductions, into the pipe line to which the wells of the lessee may be connected or into any storage designated by the state and connected with such wells.' " Emphasis supplied.

Chapter 108, Laws of 1927, at the time of its enactment was considered to be a rather complete code on the leasing of state lands for exploration for oil and gas and the extraction thereof, and in such enactment the legislature for the first time uses the word "bonus" in connection with oil and gas leases.

Section 12 of Chapter 108, Laws of 1927 (now R. C. M. 1947, sec. 81-1712), provides: "All fees, rentals, penalties, *royalties and bonuses* collected for or under such leases shall be paid to the register of state lands and by him credited as follows: All fees and penalties shall be credited to the state general fund; all rentals shall be credited to the income fund of the grant to which the lands under each lease belong; all moneys collected as *royalties and bonuses* shall be credited to the permanent fund arising from the grant to which the land under each particular lease belongs and become and forever remain an inseparable and inviolable part thereof; provided, however, that *all royalties and bonuses* collected from the lands forming part of the capitol building grant shall be available as income the same as all other

receipts from such lands; and provided further that all moneys received as rentals, *royalties and bonuses* for or under leases on lands owned by the state of Montana and not held in trust for the public schools of the state or for any state institution shall be credited, one-half to the state general fund and one-half to the state permanent revenue fund as defined by article XXI of the constitution." Emphasis supplied.

It is clear that the "royalties and bonuses" mentioned in section 12 of Chapter 108, Laws of 1927, are the same royalties and the same bonuses theretofore mentioned in section 4 of the same Act, Ch. 108, and that such royalty and such bonus become available only as and when the oil is produced and after "such oil * * * is run into any pipe line or storage tank to the credit of the lessee," at which time the state is entitled to receive its share of "any bonus actually paid, or agreed to be paid, to the lessee, for such oil". Chapter 108, sec. 4, Laws of 1927, R. C. M. 1947, sec. 81-1704.

The quoted words "such oil" refer to and only mean such oil as has been produced and has been "run into any pipe line or storage tank to the credit of the lessee," and the phrase "plus any bonus actually paid, or agreed to be paid, to the lessee," means the additional amount, premium or bonus for which the oil is sold, over and above "the posted field price existing on the day such oil * * * is run into any pipe line or storage tank to the credit of the lessee".

The first sentence of the fourth paragraph of section 11 of the Enabling Act, as amended, so far as applicable to the state school lands here involved provides that, "the *proceeds from the sale and other permanent disposition* of any of the said lands and from every part thereof, shall constitute permanent funds for the support and maintenance of the public schools and the various state institutions for which the lands have been granted."

R. C. M. 1947, sec. 81-901, in part, provides: "Lands which in the judgment of the board are likely to contain valuable deposits of coal, oil, oil shale, gas, phosphate, metals, sodium and, or other valuable mineral deposits, shall not be subject to

sale, either the surface land or any of such deposits therein; provided, however, that this shall not be so construed as to prohibit the sale of lands containing sand, gravel, building stone, brick clay or similar materials.''

R. C. M. 1947, sec. 81-902, provides: "All coal, oil, oil shale, gas, phosphate,, sodium and other mineral deposits, except sand, gravel, building stone and brick clay, in lands belonging to the state of Montana, or which may hereafter become the property of the state, which have not already been reserved by the United States, are hereby reserved to the state. All such deposits are reserved from sale except upon a rental and royalty basis as provided by law. * * * The state also reserves for itself and its lessees the right to enter upon such lands to prospect for, develop, mine and remove such deposits and to occupy and use so much of the surface of the said lands as may be required for all purposes reasonably extending to the exploring for, mining and removal of such deposits therefrom, but the lessee shall make just payment to the purchaser for all damage done by reason of such entry upon the land and the use and occupancy of the surface thereof.''

In the second sentence of the fourth paragraph of section 11 of the Enabling Act as amended, Congress made clear its intention as to how rentals from leased lands should be employed by providing: *"Rentals on leased lands * * * shall be available for the maintenance and support of such schools and institutions."* Emphasis supplied.

Original section 5 of Article XI of the Constitution of Montana as adopted by the constitutional convention and as ratified by the people in 1889 provided: "The interest on all invested school funds of the State, and all rents accruing from the leasing of any school lands, shall be apportioned to the several school districts of the State in proportion to the number of children and youths between the ages of six and twenty-one years, residing therein respectively, but no district shall be entitled to such distributive share that does not maintain a public free

school for at least three months during the year for which distribution shall be made."

Section 5 of Article XI, supra, was amended by Chapter 149, Laws of 1919, approved at the general election on November 2, 1920, and effective under the governor's proclamation December 6, 1920, and provides: "Ninety-five per centum (95%) of all the interest received on the school funds of the state, and ninety-five per centum (95%) of all rents received from the leasing of school lands and of all other income from the public school funds shall be apportioned annually to the several school districts of the state in proportion to the number of children and youths between the ages of six (6) and twenty-one (21) residing therein respectively, but no district shall be entitled to such distributive share that does not maintain a public free school for at least six months during the year for which such distribution is made. The remaining five per centum (5%) of all the interest received on the school funds of the state, and the remaining five per centum (5%) of all the rents received from the leasing of school lands and of all other income from the public school funds, shall annually be added to the public school funds of the state and become and forever remain an inseparable and inviolable part thereof."

"First Come,—First Served." At all times prior to January 1934 the state board of land commissioners issued all its oil and gas leases upon a "first come,—first served" basis. Under this policy the first qualified applicant presenting his application for a lease got it. There was no advertising. There was no competitive bidding.

Following the enactment of Chapter 108, Laws of 1927, wherein the Legislature prescribed that the "minimum annual money rentals to be paid to the state for oil and gas leases * * * shall be seventy-five cents (75¢) for each acre of land leased", the board continued with its "first come,—first served" policy, acting simply upon the written application of the first qualified applicant who merely offered and paid the minimum price of 75¢ per acre in advance for rental for the first year and there-

after paid annually the same statutory minimum so long as his lease was in effect. Under such policy the state of Montana, the common school funds of the state, the pupils of those schools and the taxpayers of the state suffered. They were the losers. The oil industry was the gainer. The applicants for oil and gas leases never offered or paid and the state never received anything other than the minimum 75¢ per acre rental. Thus did the school lands and school children of the state of Montana subsidize the oil industry.

*Competitive Bidding.* On January 22, 1934, at the time that Governor Frank H. Cooney, Secretary of State Sam W. Mitchell, Attorney General Raymond F. Nagle and Superintendent of Public Instruction Elizabeth Ireland, comprised the state board of land commissioners, said board, by resolution, adopted the policy of advertising oil and gas leases and calling for competitive bids thereon. The board's resolution establishing such policy, appearing at page 428 of the minutes of the land board of January 22, 1934, is as follows: ''The board unanimously decided to issue no more original oil and gas leases on state lands without advertising the lands for which applications have been made in two issues of the Montana Oil Journal, published at Great Falls, Montana, the first publication to appear about 15 days before the date set for leasing and the leases to be awarded through competitive bidding. Exceptions from rule will be made in the case of applications for renewal of oil and gas leases in accordance with Section 15, Chapter 108, Laws of 1927, as amended by Chapter 171, Laws of 1933.''

The above policy of the board so adopted has been followed at all times since and it is this policy alone that is responsible for placing in the state treasury all of the moneys and funds which, since February 5, 1953, have been the subject of controversy and dispute,—first in the legislative assembly and then in the courts.

Had it not been for the efficient, conscientious and businesslike administration of the state land department and the carrying out of the policy of competitive bidding so adopted by it

in January 1934, all that the state would have received from the oil and gas leases issued on state school lands in the calendar year 1952 would have been the rentals computed on the minimum of 75¢ per acre per year. This would have produced the total sum of $640,270 and no other or greater amount.

Counsel for respondent have made various contentions herein some of which are most inconsistent. They contended: That the oil and gas leases issued on the school lands are not leases; that the transactions evidenced by written instruments labeled "State of Montana Oil and Gas Lease" are not lease transactions at all but that, in legal effect such transactions are sales; that any cash moneys paid out of pocket by the successful bidder for a state oil and gas lease that is in excess of the statutory minimum of 75¢ per acre are no part of the "annual rental" on the lease as is stated in the executed lease, but that all such moneys in excess of the 75¢ statutory minimum are either (1) "royalty," (2) "bonus" or (3) "the proceeds from the sale and other permanent disposition" of the particular school lands described in the lease. We find no merit in any of the above contentions so made.

The word "bonus" as used in connection with the state's oil and gas leases means and refers to the additional amount or premium actually paid or agreed to be paid to the lessee, over and above the "posted field price existing on the day such oil * * * is run into any pipe line or storage tank to the credit of the lessee" as is stated in R. C. M. 1947, sec. 81-1704, and also in paragraph 6 in the state's printed form of oil and gas lease. "Bonus" here means that and nothing more.

The word "royalty" originated in England, where it was used to designate *the share in production* received by the Crown from those to whom the right to work mines and quarries was granted; it consists of *a share in the oil* and gas produced under a lease as compensation.

The word "royalty" as used in connection with the state's oil and gas leases means and refers to the state's share in production to be received by the state only after oil has been dis-

covered and produced from the leased lands. Until there is production the state is entitled to no share in production. In other words, no production,—no royalty.

After production, then only do the royalty obligations arise and continue so long as production continues. Thus it is clear that "royalty" refers not to oil and gas in place, but to a share in the oil and gas produced and it is equally clear that the words "royalty" and "royalties" as used in our statutes governing the leasing for oil and gas of the state's school lands are not synonymous with, and that they do not include the words "rent," "rental," and "rentals."

In 2 Thornton Oil and Gas, Willis, sec. 363, p. 644, the author cautions that "care must be taken to distinguish between rent and royalty in connection with gas and oil leases. Rent is the term applied to the privilege given to bore for gas and oil and for delay in beginning operations; while royalty is a certain percentage of the oil *after it is found,* or so much per gas well developed." Emphasis supplied.

The word "rent" is derived from the Latin word *reditus* meaning a return. It is return or pay for the use of the landlord's premises. The word "rental" is commonly used as synonymous with "rent."

*"Advance royalties."* In its decision the district court held the 75¢ per acre per year paid by lessees on the oil and gas lease to be "rental within the meaning of the statute and are to be distributed into the income fund of the school system" and then said that "it necessarily follows that the bonuses bid throughout the years are in the nature of advance royalties, are capital in their nature and properly belong in the permanent school fund."

The court was correct in holding that when a successful bidder pays the minimum of 75¢ per acre for the first year's rental on his lease, the moneys so paid are rental and that such moneys are to be placed in the common school interest and income funds. However this same situation obtains whether the bid for the first year's rental be the minimum of 75¢ or whether it be 80¢

or $80 per acre. The amount of the successful bid does not alter or change the nature of the initial payment for it remains rental and is to be placed in the interest and income fund whether the bid be the low minimum of 75¢ or whether it be the highest bid obtainable at a spirited competitive bidding.

So far as concerns state oil and gas leases on school lands under our present laws there can be and there are no "advance royalties" or royalties of any other kind or character in advance of the actual production of oil and the running of such oil so produced into a pipe line or storage tank and the district court erred in holding to the contrary.

Accordingly the injunction is ordered dissolved, the judgment and order of the district court are reversed and the cause is remanded to the district court with directions to dismiss the action. Remittitur will issue forthwith.

MR. JUSTICE BOTTOMLY concurs.

MR. JUSTICE FREEBOURN (concurring).

I concur in the foregoing opinion. The Enabling Act, section 11, makes it clear that the parties to such pact intended: (1) If the lands given by the United States for public school purposes were held intact, "Rentals * * * and all other actual income" from such lands "shall be available for the maintenance and support of such schools and institutions" and (2) if such lands were sold or any part thereof permanently disposed of the money received therefor should become permanent funds for the support and maintenance of the public schools and named institutions.

Oil royalty and oil bonus come into being only when oil is brought to the surface and, because such oil when taken is deemed a permanent taking and disposition of part of the land, the money received as oil royalty and oil bonus, paid only after the oil is produced and the quantity thereof determined, constitutes permanent school funds.

The bonus or premium under discussion here, and paid before

the lease is granted and entered into, cannot be oil royalty or oil bonus. It is not paid for oil produced, but is bid and paid solely as an inducement to secure the lease of the lands.

The lands so leased may never be drilled upon and, if drilled upon, may never produce oil.

Even if such premium or bonus be held to be separate and apart from rental, it certainly, nevertheless, falls within the plain meaning of the words contained in section 11 of the Enabling Act, "all other actual income".

It constitutes, therefore, not a part of the permanent school funds, but is "other actual income * * * available for the maintenance and support of" the public schools and other named institutions.

MR. JUSTICE ANDERSON, (dissenting).

This court did not hold a conference on this cause until this day. I have had no opportunity to study or otherwise consider the matters contained therein and therefore proceed to render my opinion without the benefit of comment regarding the opinion of the majority. My results are as follows:

This is an appeal from a judgment and an order granting a permanent injunction preventing Charles L. Sheridan, state treasurer, and John J. Holmes, state auditor, from distributing $5,500,903.10 received as premium first year, so-called rentals, on oil and gas leases on state lands, to the common school interest and income fund, and compelling the placing of that sum in the permanent fund.

The Organic Act of the Territory of Montana provided that sections 16 and 36 in each township shall be reserved for the purpose of being applied to schools in Montana territory.

Article XI, sec. 5, of the Constitution of Montana, provides as follows: "Ninety-five per centum (95%) of all the interest received on the school funds of the state, and ninety-five per centum (95%) of all rents received from the leasing of school lands and of all other income from the public school funds shall be apportioned annually to the several school districts of the state in proportion to the number of children and youths between

the ages of six (6) and twenty-one (21) residing therein respectively, but no district shall be entitled to such distributive share that does not maintain a public free school for at least six months during the year for which such distribution is made. The remaining five per centum (5%) of all the interest received on the school funds of the state, and the remaining five per centum (5%) of all the rents received from the leasing of school lands and of all other income from the public school funds, shall annually be added to the public school funds of the state and become and forever remain an inseparable and inviolable part thereof.''

R. C. M. 1947, sec. 81-1712, provides in part as follows: ''All fees, rentals, penalties, royalties and bonuses collected for or under such leases shall be paid to the register of state lands and by him credited as follows: All fees and penalties shall be credited to the state general fund; all rentals shall be credited to the income fund of the grant to which the lands under each lease belong; all moneys collected as royalties and bonuses shall be credited to the permanent fund arising from the grant to which the land under each particular lease belongs and become and forever remain an inseparable and inviolable part thereof * * *.''

The salient parts of the Enabling Act are set out and discussed in another part of this opinion.

The practice of the state board of land commissioners has been to offer the school lands of this state for oil and gas lease under competitive bidding. Bids are not accepted for less than the statutory minimum of 75¢ per acre. The bidders are instructed by the board that the amount of the bid is rental for the first year and that thereafter the rental is 75¢ per acre per annum. This practice has been carried on since 1944. However, except for the year 1952, there has been little activity in oil and gas leases and therefore the amount received by the state for the first year, so-called, rental has not been great. In the year 1952 the first year, so-called, rentals, over and

above the 75¢ per acre minimum annual rental, netted the state $5,790,424.32.

Appellants claim that the amount received is rent income and therefore must be apportioned annually, although the board in its minutes and records refers to this type of proceed as a bonus.

Respondents take the position that the amount received is a bonus and in the nature of a sale of the realty and therefore must be credited to the permanent school fund and remain an inseparable and inviolable part thereof.

A great deal of argument was made by both sides regarding what is intended by the Legislature in its use of the term "bonus." I think that little difference is made, by what the legislature intended, if there can be found the basis of the distribution of the proceeds in the Organic Act, the Enabling Act and the Constitution of this state.

The appellant says that the practice followed in the instant case has been followed for years and therefore is an established custom and for that reason same should not be disturbed by this or any other court. Here again we must look to the Acts above referred to to find the legal basis for the custom if there is any.

It is my studied opinion that the Congress, in adopting the Enabling Act, had in mind accomplishing two things in connection with land grants, viz.: (1) A source of income, either from the land itself or from the interest from the money derived from the sale thereof, and thus the permanent fund is set up; and (2) that the income from the permanent fund or from the rent of the land should be reasonably uniform from year to year so that it could be expended for school purposes, not all in one year, but equally during all of the years during which the land is parcelled out by lease, or otherwise used for income purposes.

The question of whether or not a large income, representing many years of lease tenure, should or should not be allocated in one year was not a part of the issue in this case. It is my judgment that the large accumulation during one year of so-called first year rental, and allocation thereof in the next year

to the exclusion of other years during which the lease is to run, was never contemplated by any laws herein referred to or otherwise.

The record discloses that the board of land commissioners lease agricultural land and the highest bidder is required to pay the same rental each year throughout the term of the lease. This practice follows the letter and spirit of the Enabling Act and provides a uniform income which should be allocated as it accrues.

In the case of State ex rel. Attorney General v. Hatcher, State Treasurer, 115 Tex. 332, 281 S. W. 192, 194, the court pointed out the distinction between grazing leases and mineral leases as follows: "* * * it is generally known that the University has leased its pasture lands for grazing purposes, and that the rentals arising therefrom have not been placed in the permanent fund. Since grass and growing crops are a part of the realty generally, it might be contended that the proceeds from a sale of the grass must also become a part of the permanent fund of this institution. That question is not before us in the case at bar. But, if it was, it seems quite clear to us that the courts recognize a distinction between minerals taken from the land and crops reproducing themselves annually or oftener. The former is a *permanent* taking of the *corpus* of the property. The latter does not in any sense permanently deplete the value of the land. Grass dies down each year and comes back in due season, even if not eaten by cattle."

The board properly considered and felt itself obliged to distinguish between leases granted for a right to explore underground for oil and gas from agricultural and grazing leases. The practice of disposing of an interest in school lands was proper, but that its determination as to disposition of the funds is clearly wrong.

On account of the apparent conflict herein referred to, existing in all the law relative thereto, it is no surprise that men should have differences of opinion on the subject, and I have not the slightest doubt that the members of the board in attempt-

ing to allocate the funds were actuated by the highest and most honorable motives, particularly in view of the fact that the permanent as well as the income fund both are destined for the ultimate benefit of the schools of the state.

R. C. M. 1947, sec. 81-1703, provides in part as follows: "The minimum *annual money rentals* to be paid * * * for oil and gas leases under the provisions of this act shall be seventy-five cents (75¢) for each acre of land leased * * *." Emphasis supplied.

There is no authority for the board to lease the land for a larger cash rental the first year than for the subsequent years as is contemplated by the terms of the lease. If the board had such authority it is obvious to see how it could, strictly on a rental basis, as appellants say it has the right to do in the instant case, deprive the schools of the use of the substantially equal and uniform sums annually as was contemplated by the Enabling Act, by the Constitution and by the statute itself.

It is conceivable, if this practice were allowed, that the board of land commissioners could, if the lease period is extended for oil and gas leases beyond the present 20 year term, as it is now contemplated under a law passed in the 33rd Legislative Assembly, tie up school lands for a great number of years, giving to the immediate school needs a vast sum of money to be expended currently and giving to the school districts for many years to come the bare minimum income of 75¢ per acre. Such an intention cannot be found in R. C. M. 1947, sec. 81-7103, in the Constitution, or in the Enabling Act or elsewhere.

The very thing which was intended by Congress, by the framers of the Constitution of Montana, and by the Legislature is made sham by such a procedure.

The Enabling Act, sec. 11, as amended by Chapter 18, Laws of 1949, provides in part as follows: "Except as otherwise provided herein, the said lands may be leased under such regulations as the legislature may prescribe. Leases for the production of minerals, including leases for exploration for oil, gas, and other hydrocarbons and the extraction thereof, shall be for such term of years and on such conditions as may be from time to time

provided by the legislatures of the respective states; leases for grazing and agricultural purposes shall be for a term not longer than ten years; and leases for development of hydroelectric power shall be for a term not longer than fifty years. * * *

"With the exception of the lands granted for public buildings, the proceeds from the *sale and other permanent disposition of any of the said lands and from every part thereof,* shall constitute permanent funds * * *." Emphasis supplied.

It would seem at first blush that there may be an inconsistency between the two parts of the Enabling Act above quoted. However inconsistent those provisions may appear, they are not so when considered in the light of the intent of Congress when the land was granted.

In the case of School District No. 23 v. Commissioners of Land Office, 166 Okl. 226, 27 Pac. (2d) 149, 153, the court held that all funds arising from oil and gas leases on school lands must go into the permanent fund. The court said: "We think it clear that it was the intention of Congress in passing the Enabling Act, and the framers of the Constitution of the State of Oklahoma, and the people in adopting the same, that all funds arising from bonuses, royalties, and rentals for oil and gas leases contemplated a diminution of the corpus of the school lands and that the same shall be carried into and credited to the permanent funds for the uses and purposes designated in the grant of such lands by Congress to the State of Oklahoma * * *."

There are similar decisions in Wyoming and Texas, and these cases were mentioned in a Montana case without approval or disapproval. Toomey v. State Board of Land Commissioners, 106 Mont. 547, 81 Pac. (2d) 407.

It is conceivable that annual rentals for ordinary use of the land were contemplated and gave to the lessee the right to use the surface of the land, to prepare for the operation he is intent upon doing, i. e., to prepare for drilling and exploring for oil and gas and other hydrocarbons. However, since no question was raised as to the right of the state to exact 75¢ per acre per annum for the ordinary use to which the land is to be put, I

accept the position of both parties that the same may be considered as rent. There are cases holding that all of the money paid for oil and gas leases constitute proceeds from the sales of the land which must be placed in the permanent fund. School District No. 23 v. Commissioners of Land Office, supra.

The proceeds of leases are, of course, rents, since that is the name commonly given them; but they may be the compensation for the ordinary use of property, and then may be called ordinary rent. Again, the proceeds may arise from and represent the corpus of the land; but no suitable terminology has been devised to distinguish them from ordinary rent. The distinction is necessary only when there is a dispute existing as to the ownership thereof. The opening up of new mines is not generally an ordinary use and the rents therefor are derived from the corpus of the estate and are different from the rents contemplated by an ordinary agriculture or grazing lease. State v. Snyder, 29 Wyo. 163, 212 Pac. 758. See also McLaren Gold Mines Co. v. Morton, 124 Mont. 382, 224 Pac. (2d) 975, wherein this court approves the rule here announced.

It is my view that Congress did not intend a valuable part of the land should ever be parcelled out when that parcel would become, after the use to which it is put, forever and for all time worthless unless the true market value be obtained therefor and the money paid in consideration of it placed in the permanent fund.

The Enabling Act uses the following language: "* * * the proceeds from the sale * * * of the said lands". This language contemplates an out-right sale in fee without reservation. However, the words, "and other permanent disposition", are supplied in the Enabling Act. I am of the opinion that Congress viewed the possibility of sales other than outright sales in fee of every interest, and the disposition of the right to explore and thus deplete the oil and gas deposits is one of the so-called "other permanent dispositions."

The mere fact that the state of Montana always reserves to itself the oil, gas and mineral rights when it sells the land to a

buyer dispels any other logical conclusion than that it placed a value on the corpus of such an estate which it could, and most likely would, dispose of later.

The Congress, in its wisdom, foresaw the separate interests in the land and provided for the disposition of oil and gas rights by granting to the state a practical method of disposal of the same, namely by lease.

I think that the lease of the right to explore is a mode of sale, and constitutes the best reasonable method by which such a right could be, in fact, disposed of.

True, as appellants argue, the lessee may give up his lease or it may be taken from him for violation of a covenant, but it must be remembered that the contemplation of a thorough exploration is and can be expected once the lease is executed. The exploration is accomplished whether oil and gas are found or not; the only thing the state had to sell is gone for all time. If the lease is terminated before complete exploration, then the state may again sell, according to the mode provided, that which is left to sell, and again it would be sold, most likely, according to the best method provided, namely by lease. Often in the sale of real property the property sold reverts to the seller. In such cases a permanent disposition is contemplated just as it is here.

Here we might say that the state, like any other owner of the oil and gas rights, could by amending the statute relative thereto, sell those rights outright. If this method of sale was used, it is obvious that the proceeds from the sale would go into the permanent fund and no benefit would be exacted from the proceeds of such a sale for the income and interest fund except as provided by law.

It is obvious that Congress wanted to provide the best possible method of disposition of interest in land for the state, and in its judgment the best interests of the state might be served through a sale by a method of so-called leasing.

Congress further provides in the Enabling Act language strongly in support of the above reasoning. The Enabling Act

goes on to say: "* * * provided, however, that none of such lands, nor any estate or interest therein, shall ever be disposed of except in pursuance of general laws providing for such disposition, nor unless the full market value of the estate or interest disposed of, to be ascertained in such manner as * * * provided by law, has been paid or safely secured to the state."

The Constitution of the state has a similar provision. The Act itself speaks of lands, estates and interest therein shall never be disposed of except in pursuance of the law providing for such disposition.

The board of land commissioners has the management and control, as a trustee, of two trusts: (1) The permanent fund, and (2) the interest and income fund. Granting that the state holds the title in fee, it holds it for the benefit of the permanent fund as well as for the benefit of the income and interest fund, and it has no right to sell, by lease or otherwise, the estate for the benefit of the income and interest at the expense of the permanent fund. State v. Snyder, 29 Wyo. 163, 212 Pac. 758.

We find here a set of facts similar to a life estate in the fee with the remainder over to another. Courts almost universally hold that a life tenant has no right whatever, as against a remainderman, to open up new mines or quarries or oil or gas wells, or lease the land to others for that purpose, unless the grant specifically gives to the life tenant such a right. State v. Snyder, supra. If a life tenant has no such right, neither does a trustee.

A tenant for life is entitled to the full use and enjoyment of the property in which he has a life estate, but cannot do anything which has the effect of permanently diminishing the value of the future estate. 33 Am. Jur., Life Estates, Remainders, etc., sec. 217, p. 699; Am. Law Inst. Restatement, Property, Vol. 1, sec. 138, p. 450, Vol. 2, sec. 204, p. 843. Cases on this point are too numerous to cite.

In McLaren Gold Mines Co. v. Morton, 124 Mont. 382, 224 Pac. (2d) 975, 981, the Supreme Court of Montana recognizes that a mineral lease is in effect a sale, and that the so-called

"rent" is purchase money. There, this court quotes with approval from 3 Lindley on Mines (3rd Ed.), sec. 861, pp. 2134-2138, as follows: "We have already seen that mineral in place is land; that when it is taken therefrom and changed into personal property, real estate has to that extent been destroyed. It is obvious that the normal relation of landlord and tenant does not contemplate destruction of the estate by the tenant, and that such destruction cannot properly be called 'use.' It is equally plain that the so-called 'rent' in a mining lease is something more than a return for the possession and use of real property. While the contract is in name a lease, it amounts in fact to a sale, and if it grant the right to take all the mineral, it is a sale of real estate—the lessee's interest is a fee in the mineral and the lessor's so-called rent is purchase money for real estate.

" 'Such rents or royalties are principal, and not income, and must be so treated in the ascertainment of the respective interests of life tenants and remaindermen. * * *' ''

In the instant case the individual lessee paid a bonus, or whatever one wishes to call it, for an oil and gas lease and when he received it he paid for a salable right of impairment or diminution of the fee.

In School District No. 23 v. Commissioners of Land Office of Oklahoma, supra, the learned Justice pointed out that no person would pay as much for an agricultural lease under such circumstances where the land has been leased for oil and gas as they would if the oil and gas lease had not been executed. Or, during the life of the oil and gas lease, a well may be drilled upon the leased premises, slush pits dug and a large amount of slush run therein, salt water may be encountered, some of the wells may be producers and others may be dry holes, and a number of other things may happen, which it is common knowledge do happen, to reduce the value of the surface of the land and practically destroy a portion of the same for agricultural purposes and thereby reduce its value.

I think a further plausible reason to show that a salable right

of impairment or diminution of the land was bought and paid for by the lessee could be summed up in the following manner. The lease provides that the lessee covenants and agrees to drill at least one well upon the leased premises not less than six inches in diameter to the depth of at least one thousand feet, within two years, and further agrees if oil is not found, to drill with diligence to such depths as may be necessary to make a reasonable test for oil and gas. *The lease, however, contemplates a complete exploration of the underground possibilities of discovery.* The drilling of one well is a minimum requirement only.

It cannot be denied by anyone that the reason for the lessee bidding for his right to lease is because he and others think there is oil or gas under the surface of the premises.

For example, $500 an acre might be bid for a specific 80 acre tract. There may be a lesser value per acre and thus a smaller bid for a contiguous 80 acre tract. It appears to be the board's duty to lease the state's land and to obtain therefor the reasonable market value for the lease. The amount of money paid for the right to explore is of no consequence here, provided the state exacts the reasonable market value at the time the sale is made.

Once the lessee has explored the under surface strata as contemplated by the lease two things happen: (1) He either finds oil and eventually depletes the lease; or (2) he does not find oil or gas and abandons the lease. In either case the state of Montana has forever lost its right to a salable value to the land itself and the fee is diminished and impaired to that extent. Surely no one will again bid upon the expectation of finding oil and gas at the levels already explored, when it has once been determined that there is no oil or gas at those depths. The right exhausted, whether oil and gas are found or whether no oil and gas are found, is gone forever and the right of a permanent taking, from a part of the intrinsic value of a fee, was never contemplated by the lease, the Enabling Act, the Constitution, or the laws, whether it be an oil and gas lease or some other type of lease.

Article XI, sec. 2, of the Constitution of Montana, provides as follows: "The public school fund of the state shall consist of the proceeds of such lands as have heretofore been granted, or may hereafter be granted, to the state by the general government known as school lands * * *."

Article XI, sec. 3, of the Constitution of Montana, provides: "Such public school fund shall forever remain inviolate, guaranteed by the state against loss or diversion * * *."

In the instant case it is my opinion that the money received as a bonus or premium paid as consideration for the lease is a sale of a right to impair or diminish the fee, and, therefore, the money derived therefrom should go into the permanent fund and shall forever remain inviolate as provided by law.

The judgment of the lower court should be affirmed.

MR. JUSTICE ANGSTMAN, (dissenting).

I concur generally with what is said in the dissenting opinion of MR. JUSTICE ANDERSON but desire to add the following:

I agree with what is said in the majority opinion on the general subject of the history of the legislation bearing upon the disposal of school lands thought to contain oil or gas.

There is but one narrow question involved on the appeal. That question is: What is meant by the phrase in sec. 11 of the Enabling Act that "the proceeds from the sale and other permanent disposition of any of the said lands and from every part thereof, shall constitute permanent funds for the support and maintenance of the public schools".

Likewise and bearing upon the question is the fact that both section 11 of the Enabling Act and section 1 of Article XVII of the Montana Constitution provide: "none of such land, nor any estate or interest therein, shall ever be disposed of except in pursuance of general laws providing for such disposition, nor unless the full market value of the estate or interest disposed of, to be ascertained in such manner as may be provided by law, be paid or safely secured to the state".

It is my opinion that an oil and gas lease operates to dispose

of an estate or interest in real estate. It is the only method recognized by which to dispose of oil bearing lands covered by the Enabling Act. It is so provided in R. C. M. 1947, secs. 81-901 and 81-902. The latter section in speaking of oil bearing lands provides in part: ''All such deposits are reserved from sale except upon a rental and royalty basis as provided by law.'' There is implicit in that statement a legislative declaration that there is a sale when they are disposed of on a rental and royalty basis. The situation is exactly the same as a lease of land containing mineral in place and this court has held that such a lease constitutes a sale of real estate. McLaren Gold Mines Co. v. Morton, 124 Mont. 382, 224 Pac. (2d) 975.

In my opinion the premium or bonus involved here represents proceeds from the sale of lands or proceeds from a permanent disposition of such lands or some part thereof.

The question of the meaning of the word bonus in connection with an oil lease was discussed in the case of Work v. United States ex rel. Mosier, 261 U. S. 352, 43 S. Ct. 389, 391, 67 L. Ed. 693, where the court said: ''The bonus which was the result of bidding for desirable and profitable oil and gas leases secured for the members of the Osage Tribe the just value of the use of their property which the fixing of royalties in advance by the President was not adapted to give them. It was in effect a supplement to the royalties already determined. It was really part of the royalty or rental in a lump sum or down payment. We do not see how it can be classified as anything else.''

That the bonus is not rental seems plain because it is not paid annually. The Legislature of Montana contemplated that rentals shall be paid annually. R. C. M. 1947, sec. 81-1703.

The cash bonus or premium negatives the idea that it is paid for the use of the surface of the ground for oil drilling purposes. The bonus or premium was the bidder's estimate of the value of the property for oil producing purposes. It was the bidders' method of placing a value—though speculative and uncertain in character—upon the oils underneath the ground. It constituted in effect supplemental royalty if oil was produced, and

the bidders' estimate of what he could afford to pay as a lump sum, down payment on the hope and prospect that he would find oil. The amount on any given tract of land depended, as the trial judge held, upon the location of the land, the geological structures, and the belief on the part of the bidder, that the land was valuable for the purpose of exploration for oil.

While there may be distinguishing features in the following cases on immaterial matters, in essence they support the result which I have reached as stated above. Sheppard v. Stanolind Oil & Gas Co., Tex. Civ. App., 125 S. W. (2d) 643; State ex rel. Attorney General v. Hatcher, 115 Tex. 332, 281 S. W. 192; Commissioner of Internal Revenue v. Clarion Oil Co., 80 U S. App. D. C. 41, 148 F. (2d) 671; Alexander v. King, 10 Cir., 46 F. (2d) 235, 74 A. L. R. 174; School District No. 23 v. Commissioner of Land Office, 166 Okl. 226, 27 Pac. (2d) 149; Barnes v. Keys, 36 Okl. 6, 127 Pac. 261, 45 L. R. A., N. S., 178; State v. Snyder, 29 Wyo. 163, 212 Pac. 758.

The majority opinion holds that the meaning of the word bonus is that given in R. C. M. 1947, sec. 81-1704.

The bonus here in question is not a bonus after production. It is a bonus or premium bid for the land in excess of the minimum of 75¢ per acre and is paid in a lump sum and not annually. The amount of the bid depends upon the bidder's notion of the amount of oil beneath the surface. It has nothing to do with the rental value of the surface of the land, unconnected with the subsurface contents of the land.

There is authority holding that all of the money paid for an oil and gas lease constitutes proceeds from the sale of land which must be placed in the permanent fund. School District No. 23 v. Commissioners of Land Office, supra.

I think if that question had been urged here a showing might have been made that even a part of the 75¢ per acre should be placed in the permanent fund.

In other words if the 75¢ per acre, in fact, exceeds the value of the use of the surface of the land for purposes of exploration for oil and gas to the extent of such excess it should go into the

permanent fund. Since no question was raised as to the 75¢ per acre and since no record is before us from which we can tell how much of the 75¢ per acre is for the value of the use of the surface of the land for exploration purposes, uninfluenced by prospects of oil underneath the surface, I accept the position of both parties that the whole of it may properly be considered as rental.

The suggestion in the specially concurring opinion of MR. JUSTICE FREEBOURN that the premium if not rental is "other actual income" within the meaning of the Enabling Act, I think is unsound because that conclusion would apply as well to royalty. And the fact that oil is never produced is no different than upon a sale of real estate where the down payment is forfeited by failure to meet subsequent installments of the purchase price.

In such a case the down payment is part of the permanent fund as for a sale even though the sale is not finally consummated.

I think for the reasons herein stated as well as those stated in the opinion of MR. JUSTICE ANDERSON, the judgment of the trial court was right and should be affirmed.