TREASURE COUNTY, MONTANA, a Body Politic and Corporate, Plaintiff and Respondent, v. MOUNTAIN STATES CLAY PRODUCTS, Inc., a Corporation, Defendant and Appellant.

No. 9354.
Submitted May 31, 1957. Decided July 29, 1957.
313 Pac. (2d) 1028.

Mr. H. G. Young and Mr. Russell K. Fillner, Forsyth, for appellant.

Mr. Forrest H. Anderson, Atty. Gen., Mr. E. E. Fenton, former County Atty., and Mr. John A. Forsythe, County Atty., Hysham, for respondent.

Mr. Fillner and Mr. Forsythe argued orally.

MR. CHIEF JUSTICE HARRISON:

This suit was initiated by Treasure County as plaintiff to quiet its title to certain lands lying within its boundaries.

A lease was originally issued on the contested lands on September 1, 1943, to John Berggren, who is now an officer and director of the defendant, Mountain States Clay Products, Inc., for a primary term of three years ''and as long thereafter as bentonite shall be produced and marketed from said lands in commercial quantities; * * * for the purpose of exploring for, mining and removing therefrom the merchantable bentonite which may be found * * *'' This lease provided for an annual rental of $75 for each 640 acres payable in advance, the total rental being $393.75; it also provided in another clause

of the contract for a royalty of twenty cents on each ton of unprocessed bentonite. Thereafter the right, title and interest of the lessee, Berggren, was assigned to the defendant. Upon expiration of the primary term in the above-described lease the plaintiff and the defendant made and entered into a lease bearing date September 3, 1946, wherein and whereby the above-described premises were leased by plaintiff to the defendant under the same terms as the lease to Berggren. By the mutual agreement of the parties the primary term of this lease was extended for an additional period of years, expiring on September 2, 1952.

The rental provided for in the lease had been fully paid as it fell due, and on September 2, 1952, the defendant tendered to the plaintiff the annual rental for the year commencing on that date, together with the sum of $100 as royalty due to the plaintiff on 500 tons of unprocessed bentonite. This tender the plaintiff refused to accept on the basis the lease had terminated by its own terms because the defendant had not produced and marketed bentonite in commercial quantities during the primary term of the lease.

At the trial defendant gave evidence of having produced 30 tons of unprocessed bentonite, which was sold for seventy cents a ton. Defendant agreed that the royalty on this amount of bentonite would have been only $6, however it explains the discrepancy in the amount offered and the amount actually mined and produced on the basis of an oral contract of sale entered into between Berggren and one L. C. Jacox. This contract provided for from 1,000 to 10,000 tons of unprocessed bentonite, 30 tons to be delivered at the railway station at Vananda, Montana, and the remaining part of the product to be delivered in the field. The delivery was made at Vananda, and the remaining was purportedly ready in the field. However, it was made clear in other testimony that the only amount actually produced and marketed was the 30 tons referred to previously in this opinion. Jacox had purportedly paid $500 as an advance on his contract with defendant, and it is upon this

advance that defendant purported to offer the plaintiff the additional amount of royalty. In examining the books of account of the defendant, under the heading of "Royalty due Treasure County" the amount of royalty stated to be due was only $50 or the royalty on 250 tons of bentonite. Berggren could not explain this discrepancy.

Testimony was then elicted on the fact that Jacox had died subsequent to the contract and because of his death defendant had been prevented from selling the amount of bentonite which the parties had agreed upon. However, further evidence was admitted showing that Jacox had actually died subsequent to the time of expiration of the primary term of the lease, and no further delivery or production was made under this contract before his death, that is, in excess of the 30 tons referred to before.

In its finding of fact No. 8, the trial court held that the " * * * proceeds from the sale by the defendant of bentonite did not in any of the said years amount to a sum as great as said total annual rental, and that no profit, over operating expenses, has ever been realized from the production of bentonite from the lands hereinbefore described." In its conclusion of law No. 1, it held that since there had been no production of bentonite in commercial quantities during the primary term of the lease, the lease had expired and terminated by reason of such failure. Judgment was then entered quieting title in said lands in the plaintiff and decreeing the claim of the defendant in the land without right and wholly invalid. This appeal is taken by defendant from that judgment.

The defendant assigns three specifications of error on this appeal:

(1) The trial court's finding of fact No. 8 and its conclusion of law No. 1 are not supported by the evidence and are against the law;

(2) The court erred in excluding the offered evidence of Kenneth Arthur; and

(3) The court erred in entering judgment in favor of the

plaintiff and against the defendant. We will take them in the order submitted.

Since the terms of this lease are essentially identical to those in an ordinary oil and gas lease providing for a primary term of a certain number of years and so long thereafter as oil and gas or either of them is produced in commercial quantities, those cases construing that type of lease in the oil and gas field will be helpful in guiding us to the correct rules of law applicable to the lease involved in this case.

What a lessee must do before the expiration of the primary term of a lease, to extend the lease beyond that primary term and keep it alive, has been set out in Berthelote v. Loy Oil Co., 95 Mont. 434, at page 448, 28 Pac. (2d) 187, at page 191, as follows:

"Some courts have held that under a similar 'thereafter' clause, any production which is capable of being divided is a sufficient compliance to continue the life of the lease * * * [Citing cases.] Suffice it to say that we are not impressed with the reasoning in the cases so holding, and decline to follow them.

"Frequently oil and gas leases in the 'thereafter' clause provide that the lease is to continue after the fixed term so long as oil or gas is produced in 'paying quantities.' Most courts hold the legal effect of that clause and of the one 'so long as oil or gas is produced' to be the same; and *to extend the lease under a clause such as is before us, the production must be in paying quantities.* [ Citing authorities.] We prefer to follow the majority rule.

"* * * the oil or gas *must not only be discovered but must be produced,* and the production continue thereafter during the entire term." Emphasis supplied.

Commercial quantities has been defined in Sunburst Oil & Refining Co. v. Callender, 84 Mont. 178, 274 Pac. 839, as follows:

"We think the true criterion for determining whether a well is a commercial producer is: Will it pay a profit to the lessee,

over operating expenses, for its operation? If it will, although the profit may be small and may never repay the cost of development, the well may be said to produce oil in paying quantities." Citing Mills-Willingham on Oil and Gas, page 122.

While bentonite is classified as a non-metallic mineral, it has many of the attributes of a metallic mineral insofar as its presence in the earth and methods of mining and removal. This is conceded by the appellant since its argument is based in part upon authorities wherein metallic minerals were the subject under consideration.

It is evident this court meant to distinguish between those costs which may be attributed to development of the leased property and those costs attributable to operating expenses. It is here that defendant, in its first assignment of error, contends the court erred not in stating the above as the governing rule, but rather, in its application of that rule. In other words the court erred by including the annual rental payable by the defendant, lessee within the definition of "operating expenses" of mining the bentonite deposits. The defendant contends that the annual rental was a capital expenditure not an operating expense, and therefore should never have been taken into consideration in the computation of operating expenses.

Defendant cites in support of this contention McLaren Gold Mines v. Morton, 124 Mont. 382, 224 Pac. (2d) 975, which was a case involving a "Lease and Option to Purchase" whereby the lessee had leased certain lands under an agreement which provided that the lessee had the option to purchase the demised premises during the life of the lease for a stipulated sum, with any amounts of money paid as royalties under the lease, to be deducted from the purchase price.

Mr. Chief Justice Adair, who rendered the majority opinion in the McLaren case, 124 Mont. on page 393, 224 Pac. (2d) on page 981, made the following statement, quoting from 3 Lindley on Mines (3d ed.), section 861 at pages 2134-2138:

" 'In a given tract of land it is always a matter of doubt to what extent, if any, mineral may exist in paying quantities, until

very considerable development work has been performed, which requires in most instances large expenditure of capital. For this and other reasons not profitable to discuss here, a custom long ago arose for the owner of supposed mineral land to grant to a mine operator the right to enter upon the land and search for and extract mineral, and the form which the contracting parties pretty generally adopted to express their agreement was a "lease," which purported to entitle the "lessee" to occupy such part of the premises as was necessary to carry on his mining operations, and to "use" the mine and extract the minerals therefrom. In return for these privileges or rights, the so-called "lessor" usually reserved "rent" in the form of a certain sum per ton on all mineral to be produced. This form of contract seemed best adapted to the mutual protection of the parties, in view of the uncertainty of the extent and value of the mineral, and was without doubt considered by them in fact as in name a "lease." * * *

" 'We have already seen that mineral in place is land; that when it is taken therefrom and changed into personal property, real estate has to that extent been destroyed. It is obvious that the normal relation of landlord and tenant does not contemplate destruction of the estate by the tenant, and that such destruction cannot properly be called "use." It is equally plain that the so-called "rent" in a mining lease is something more than a return for the possession and use of real property. While the contract is in name a lease, it amounts in fact to a sale, and if it grant the right to take all the mineral, it is a sale of real estate—the lessee's interest is a fee in the mineral and the lessor's so-called rent is purchase money for real estate.

" 'Such rents or royalties are principal, and not income, and must be so treated in the ascertainment of the respective interests of life tenants and remaindermen. * * *

" 'Although the doctrine that a grant of all the mineral in a described tract of land, whether by deed or so-called lease, conveys an estate in the mineral as land, does not seem to have been specifically passed upon as applicable to a lease of mining

property acquired or held under the United States mineral acts, we are constrained to believe that when such questions arise, the general doctrine as herein set forth will be recognized and applied with all its attendant consequences. That doctrine, as we have seen, is based upon the principles that mineral in place is land, that a grant of the right to extract and dispose of it, and thus destroy its character as real estate, amounts to its sale as land, *and that royalties (or so-called rent), payable per quantum of the mineral taken, are purchase money and principal,* rather than rent and income. As these principles flow from the nature of mineral land as such, we can see no reason why they should not be of equal application to leases of mineral land acquired from any source'." Emphasis supplied.

The McLaren case is clearly distinguishable from the one before us for two obvious reasons:

(1) A lease with option to purchase was involved in the McLaren case, whereas in the present case the parties have merely entered into an ordinary lease of the premises for a primary term and so long thereafter as bentonite is produced in commercial quantities, no provision having been made for an option to purchase the property.

(2) In the McLaren case there was no provision for a fixed annual rental, the only consideration for the demise being a covenant to pay a royalty consisting of ten percent of all net mill or smelter returns from ore, whereas in the present case the parties provided for a fixed annual rental in *addition* to a royalty based upon the amount of ore mined.

Mr. Chief Justice Adair, in using the term "rent" and "royalty" synonymously in the McLaren case was not referring to rent in its ordinary sense, that is a charge for the use and possession of property, but rather a rent which was payable *"per quantum"* of the mineral taken; a rent or royalty which actually represented the proceeds of the mining, extraction, production and sale of the mineral in place. In the McLaren case no question was raised as to the nature of a fixed annual rental which had no relation whatever to actual production. The parties in

the present case had made an independent covenant relating to the royalty payable upon production of bentonite; by doing so it becomes apparent they intended to set out two considerations for the lease: (1) The annual rental for the use of the property; and (2) The royalty or "rent" which was payable to the lessor upon production and which represented an actual extraction or sale of the minerals.

That the distinction between "rent" and "royalty," as drawn by this court, is the proper one, is conformed by the following quotation from 2 Thornton Oil and Gas, Willis, section 363, page 644: "So care must be taken to distinguish between *rent* and *royalty* in connection with gas and oil leases. *Rent* is the term applied to the *privilege given to bore for gas and oil and for delay in beginning operations; while royalty is a certain percentage of the oil after it is found, or so much per gas well developed.*" Emphasis supplied. This same statement was quoted with approval in State ex rel. Dickgraber v. Sheridan, 126 Mont. 447, 461, 254 Pac. (2d) 390.

This court in Homestake Exploration Corp. v. Schoregge, 81 Mont. 604, 264 Pac. 388, 391, has made it clear that no interest in the minerals in place passes to the lessee upon execution of the demise, likening an oil and gas lease to a demise of the land for agricultural purposes or a demise of improved property for the purpose of conducting a grocery store. The court indicated in that case that no title vested in the lessee to the minerals until they were recovered at which time he is required to yield to the lessor the royalty agreed upon.

It is apparent from the cases referred to above that the rent ▪ provided for in defendant's lease was not purchase money on real estate, but rather was a cost of maintaining the lease, an expense of keeping the lease alive.

Defendant cites several Federal cases involving disputes on income tax, as standing for the following rules: (1) The cost of developing the mining property to its intended output level is chargeable to capital; while (2) The cost of maintaining the output to this intended level is chargeable to operating costs.

An appraisal of those cases in this opinion would be profitless, however it is evident that in determining how the taxpayer will treat a certain expense or charge for income tax purpose, that is capital expenditure and depletable, or an expense of operation and deductible, does not turn on the substantive nature of the charge or expense, but rather upon the manner in which Congress intends the taxpayer to treat it. This is more clearly illustrated by the fact that delay rentals under a mineral lease are treated as an expense of operating the lease rather than as a capital expenditure attributable to acquiring title to the lease, or an equity therein, or as development costs. Mertens, Law of Federal Income Taxation, vol. 4, sections 24, 27, and cases cited in note 35a. Included in those cases cited are several which involve the manner in which first year rentals on federally leased land shall be handled when the lease is a concompetitive one. It was held that such rentals are expenses and deductible, thus drawing a distinction between rentals on competitive leases and those on noncompetitive ones. In the former, the rentals are treated as capital expenditures in acquiring an economic interest or capital asset. Cf. United States v. Dougan, 10 Cir., 1954, 214 Fed. (2d) 511.

To base Montana's rule on such fine distinctions is to put the lessee, the lessor, and our practicing attorneys, in a morass of indecision as to where the line is drawn.

It is evident that defendant acquired nothing of permanent use or value by paying the annual rental, rather it was merely an expense of operating the lease, an annual charge which must be paid in any event, production of no production. By paying the rent, according to this state's law, the lessee acquired no interest in the land or minerals themselves, no ownership passed, he acquired no capital assets.

From the testimony adduced at trial, it appears there being no conflict therein as to this point, that defendant actually produced 30 tons of bentonite, sold it for seventy cents a ton, with a total gross receipt of $21. Since the rent alone came to $393.75

per year, it is apparent that defendant did not produce bentonite in commercial quantities as defined in this opinion.

Defendant alleges as his second assignment of error, the trial court's refusal to admit the testimony of its witness Kenneth Arthur, who, it was stipulated to by counsel, would testify that defendant had spent many thousands of dollars and performed much work in preparing the property for production. The court held this testimony was irrelevant and immaterial because it failed to prove or disprove the issue of whether bentonite was being produced and marketed from the premises in commercial quantities by September 3, 1952, the date the lease expired.

We concur with the decision of the trial court, since the only issue to be litigated was, as the trial court stated when it excluded the proferred testimony, namely: Whether bentonite was being produced in commercial quantities at the expiration of the lease. The proferred testimony clearly did not tend to prove the prime and sole issue in the case.

It has been held that an habendum clause in a lease providing for a fixed primary term and so long thereafter as oil and gas are produced in commercial quantities is a clause of special limitation; that without production during the primary term of the lease, the lease terminates and ceases automatically upon expiration of that primary term. McDaniel v. Hager-Stevenson Oil Co., 75 Mont. 356, 367, 368, 243 Pac. 582; Schumacher v. Cole, Mont. 309 Pac. (2d) 311. This rule, we find, adequately covers the rights of the lessee under this lease before us. Thus, the defendant lessee, by failing to produce bentonite in commercial quantities during the primary term of the lease, has allowed his lease to expire by special limitation, therefore we find his third specification of error without merit.

The judgment is affirmed.

MR. CHIEF JUSTICE CASTLES, and MR. JUSTICES. BOTTOMLY and ADAIR, concur.