McLAREN GOLD MINES CO., APPELLANT, v. MORTON, ET AL., RESPONDENT.

No. 8983.

Submitted October 13, 1950. Decided November 21, 1950.

224 Pac. (2d) 975.

Mr. Ralph J. Anderson, Mr. Edmond G. Toomey, and Messrs. Toomey, McFarland and Wagner, all of Helena, for appellant.

Mr. Ed C. Jones, Mr. Earl C. Ammerman, Livingston, Mr. C. W. Jones, Hardin, for respondents.

Mr. Anderson and Mr. Jones argued orally.

MR. CHIEF JUSTICE ADAIR:

This is a suit for specific performance resulting in decree for defendants and plaintiff appeals.

The suit is grounded on a contract reading:

"LEASE AND OPTION TO PURCHASE

"This agreement, made and entered into this 24th day of February, 1934, by and between Robert L. Morton, a single man, of Clarion, County of Wright, State of Iowa, hereinafter called Lessor; and Walter McLaren of Dayton, Montgomery County, Ohio, hereinafter called Lessee:

"Witnesseth that the said Lessor, for and in consideration of One Dollar ($1) to him in hand paid, the receipt of which is hereby acknowledged, and in consideration of the covenants and agreements hereinafter contained to be by said Lessee kept and performed, does hereby lease, let and demise unto the said Lessee the following described quartz mining premises, situated in the New World Mining District, County of Park, State of Montana, to-wit:

"That certain unpatented Lode Mining Claim named 'Melissa' situated in the aforesaid mining district, together with the appurtenances, water and water rights, timber and timber rights and all property of every kind and nature belonging thereto or connected therewith, with the right to mine, extract and remove ore and/or metals from the leased premises and to prospect for ore and/or minerals thereon and therein, on the terms and conditions hereinafter stated. And said Lessor covenants and agrees with the said Lessee that said Lessee shall have quiet and peaceable possession of said leased premises during the continuance of this Lease and Option to Purchase.

"To have and to hold the same unto said Lessee until the

ground is worked out or until said Lessee shall voluntarily surrender the said leased premises and this agreement, unless sooner forfeited or determined through violation of any agreement or covenant hereinafter contained by the said Lessee made.

"The said Lessee, in consideration of said lease of said premises does hereby covenant to and with the said Lessor as follows:

"1. To enter upon and take possession of said premises and hold the same under this Lease and Option to Purchase.

"2. To work the same in a miner-like manner so as to take out the greatest amount of ore possible with the crew and equipment used for the work.

"3. To allow said Lessor or his authorized agent to inspect the premises and the work being done at any time which will not interfere with the work then being carried on.

"4. To pay to said Lessor a royalty of ten per cent (10%) of all net mill or smelter returns from ore shipped from said premises, all such royalty payments to be deducted from the hereinafter mentioned purchase price for said property.

"And in consideration of the acceptance of the foregoing lease and the expenditures to be made thereunder and the faithful keeping of the covenants thereof, the said Lessee shall have the right to purchase the said demised premises for the sum of Four Thousand Dollars ($4,000) payable as follows:

"Two Thousand Dollars ($2,000) on or before One Year after said Lessor fully clears title to said premises so that he can furnish good and sufficient title clear from all incumbrances or adverse claims and Two Thousands Dollars on or before One Year after said first payment of Two thousand Dollars becomes due, it is understood and agreed that any amounts of money paid as royalties hereunder shall be deducted from any payment to become due.

"It is understood and agreed by and between the parties hereto that in the event this Lease and Option to Purchase is forfeited or determined for any reason, said Lessee shall have

the right to remove any and all machinery and equipment which he may have installed on said premises.

"In witness whereof, the parties hereto have hereunto set their hands and seals the day and year first hereinbefore written.

"Robert L. Morton,
By Dan G. Ross,
Attorney in fact."

The above contract was acknowledged by Dan G. Ross, February 24, 1934, by Walter McLaren, March 3, 1934, and, on the latter date, filed for record and duly recorded in the office of the county clerk and recorder of Park county, Montana.

Immediately upon the execution of the above contract, the named lessee entered into possession of the demised property and commenced mining operations and work thereon and prior to 1935 a tunnel was dug on the described mining claim 4 feet in width, $5\frac{1}{2}$ feet in height and approximately 50 feet in length.

July 6, 1934, Robert L. Morton as plaintiff commenced in the district court of Park county, Montana, an action to quiet title to the property described in the above contract but such action was pending and undetermined at the time of the trial of the instant suit and title to said premises has not been cleared.

April 10, 1935, Walter McLaren, the lessee, sold and, in writing, assigned to plaintiff, the McLaren Gold Mines Company, a Delaware corporation, all of his right, title and interest in the above contract. Such assignment was thereafter filed for record and duly recorded in the office of the county clerk and recorder of Park county, Montana.

Upon the execution of the assignment, the plaintiff entered into possession of the demised property and has since expended considerable sums of money and done much work in exploring, developing and mining the property, which includes work in engineering, geology, mapping, diamond drilling and the digging of shafts and tunnels.

In the year 1938, plaintiff commenced digging a second tunnel on the described claim and this work was continued during

the years 1939 and 1940. At the time of the trial the tunnel was 1,220 feet in length, the first 550 feet thereof being on the demised mining claim from which tunnel two raises were excavated, the first being 220 feet, and the second 400 feet from the portal of the tunnel. The first raise was 40 feet and the second 70 feet in height. Approximately 400 feet from the portal a 4x5 foot shaft was sunk in the floor of the second tunnel to a depth of 20 feet. Approximately 300 feet from the portal a crosscut was made extending 20 feet on either side of the tunnel. In prospecting for ore on the property, plaintiff drilled seven diamond drill holes varying from 30 feet to 225 feet in depth and did core drilling aggregating 753½ feet. The costs of the crosscuts, raises and shaft were not available at the trial but exclusive of such outlays, the plaintiff expended approximately $13,000.00 for the work done by it on the described mining claim.

While mineral bearing rock was encountered, the exploration and development work produced no sufficiently high grade ores to be of commercial value.

The plaintiff and its predecessor in interest have been in the complete, undisputed and peaceable possession of the described mining claim continuously since February 24, 1934, during which time they have done the required annual assessment work and otherwise fully complied with the several Acts of Congress suspending such work and have filed in the office of the county clerk and recorder of Park county, Montana, proper affidavits and notices of intention to continue to hold the claim.

The trial court found and the evidence clearly shows that by reason of the explorations made by plaintiff upon the demised mining claim to find ores of commercial value and the doing by it of the annual assessment work, plaintiff has performed all of the obligations imposed upon it by virtue of the contract.

After the assignment of the contract to plaintiff and while it was operating the property, Robert L. Morton died intestate at his home in Clarion, Iowa, and thereafter his estate in Park

county, Montana, was administered by an administrator appointed by the district court of such county. During the course of such administration, A. Roy Morton, son and heir at law of Robert L. Morton, died testate and the defendant Grace Morton was duly appointed and qualified as executrix of the will of A. Roy Morton, deceased, and thereafter on December 3, 1946, by decree of the above district court, the property described in the lease and option to purchase was distributed to the defendant Grace Morton as executrix of the last will of A. Roy Morton, deceased. The executrix, sojourning in the state of Washington and being a nonresident of the state of Montana, appointed the defendant T. C. White as her attorney in fact, empowering him to institute or defend any and all legal proceedings and law suits in which she was interested or a party.

Following the demise of Robert L. Morton, plaintiff sought to exercise ''the right to purchase the demised premises for the sum of Four Thousand Dollars ($4,000)'' as is expressly provided in the contract but the administrator declined to accept the consideration of $4,000 or to convey the demised property to plaintiff whereupon plaintiff filed in the probate proceeding pending in the district court of Park county, a petition for an order for the specific performance of the contract, which petition the court on August 13, 1946, ordered dismissed without prejudice but therein expressly granting plaintiff leave to commence this action.

Plaintiff expressly waived the requirement that title be quieted by the lessor.

The cause was tried to the court sitting without a jury.

On September 24, 1947, the trial court made and entered its findings of fact and conclusions of law. The findings are in plaintiff's favor but in its second conclusion of law the court concluded that a power of attorney executed October 3, 1933, by Robert L. Morton appointing Dan G. Ross as his attorney in fact ''does not confer authority upon the attorney in fact, Dan G. Ross to grant an option of sale on said mining claim.'' Where-

fore the trial court entered judgment for defendants from which plaintiff has appealed.

The lease and option to purchase was executed by virtue of the following power of attorney, viz:

## "POWER OF ATTORNEY

"Know all men by these presents, That I, Robert L. Morton, a single man, of Clarion, County of Wright, State of Iowa, do hereby appoint Dan G. Ross, of Park County, State of Montana, my attorney for me, and in my name, place and stead, to bargain, transact and agree for, purchase, receive and take rents, hereditaments and accept the seizin and possession of all lands and all deeds and other assurances and to lease, let, demise, bargain, sell, release, convey, mortgage and hypothecate lands, tenements and hereditaments upon such terms and conditions and under such covenants as he shall think fit and also for me and in my name, place and stead and as my act and deed to locate, lease, sell and do all other things necessary in connection with and in compliance with the laws of the United States Government and the State of Montana, in locating and perfecting title to mines and to preserve, manage, sell or dispose of, mortgage, lease, hypothecate or otherwise transfer any and all of said mines, as well as any other mines that I may now be the owner of or have an interest in in the State of Montana, including the right to commence any suit in court and prosecute the same through to judgment that my said attorney deems necessary in order to protect my interests, and also to locate mill sites, townsites, mining claims, and water rights and take all necessary legal steps and proceedings to accept the same and manage, work, sell, mortgage, lease or otherwise dispose of any and all of them to our best advantage, giving and granting unto my said attorney, Dan G. Ross, full power and authority to do and perform all and every act and thing whatsoever requisite, necessary, or proper to be done in and about the premises, as fully to all intents and purposes as I might or could do, if personally present, hereby

ratifying and confirming all that my said attorney shall lawfully do or cause to be done by virtue hereof.

"In witness whereof, I have hereunto set my hand and seal this 3rd day of October, A. D., 1933.

"Robert L. Morton (Seal)"

(Acknowledged October 3, 1933.)

The above power of attorney was filed for record and duly recorded in the office of the county clerk and recorder of Park county, Montana, on the same date the lease and option to McLaren was filed for record.

The question presented:

Is the above power of attorney sufficiently broad to authorize the execution of the lease and option to purchase the "Melissa" unpatented quartz lode mining claim?

A power of attorney is nothing more than an instrument in ▮ writing authorizing another to act as one's agent. The person holding a power of attorney is known as an "attorney in fact" thus distinguishing him from an attorney at law.

The rules governing the interpretation of written instruments ▮ generally govern the construction of powers of attorney. First and foremost the intention of the parties as it existed at the time the powers were granted is to be ascertained. Next and when ascertained, that intention is to be given effect. The intention is to be ascertained from the writing alone, if possible. The words used in the writing are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed. Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense. The whole of the writing is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.

While the powers granted must be strictly pursued by the

 agent, yet where the language permits, a power must be construed so as to carry out the purposes of the appointment. Holladay v. Daily, 19 Wall. 606, 22 L. Ed. 187. Where the words used are ambiguous in themselves they are to be taken most strictly against the principal and the agent in his dealings with a third person may bind his principal in accordance with usage or by any construction of the ambiguous words that is reasonable for the grant of powers is not to be frittered away by very nice and metaphysical distinctions when the general tenor of the instrument is in favor of what was done under the power and when the principal has reaped the benefit of it. Le Roy v. Beard, 8 How. 451, 12 L. Ed. 1151. A strained interpretation of the powers granted should never be given.

The power of attorney and the lease and option to purchase have to do with mining in Montana, the ''Treasure State,'' whose official state flag and seal both bear the state motto of ''Oro Y Plata'' or ''Gold and Silver.'' This state produces more than 50 per cent of all the nation's copper output, it ranks second in silver production and it also produces much gold, lead, manganese ore, petroleum and natural gas. In the state, and within the county of Park, are many mining claims and mines; some patented, many unpatented, some quartz lode claims, other placer claims.

The power of attorney executed by Robert L. Morton, appointing Dan G. Ross as his attorney in fact, manifests an intention on the part of Morton residing without the state but operating through his agent Ross, residing in Park county, Montana, of relying upon such agent's knowledge and experience, and through such agent, of acquiring, owning, protecting, financing, working, managing, developing and disposing of mines and mining property located in Montana.

The power of attorney expressly grants to Ross the attorney in fact the authority:

''to locate, lease, sell and do all things necessary * * * in locating and perfecting title to mines and

"to preserve, manage, *sell or dispose of*, mortgage, lease hypothecate *or otherwise transfer any and all of said mines, as well as any other mines* then owned by the principal or in which he has 'an interest in the state of Montana' and also

"to locate mill sites, townsites, *mining claims* and water rights and take all necessary legal steps to * * * manage, work, sell, mortgage, *lease or otherwise dispose of any and all of them* to our best advantage." (Emphasis supplied.)

Pursuant to the authority so conferred upon him the attorney in fact, in the name and for and on behalf of his principal, entered into the written contract with Walter McLaren giving to the latter a lease and option on the "Melissa" unpatented quartz lode mining claim.

There was and is nothing unusual in the contract. It is merely a common and ordinary lease with an option to purchase such as has been customarily used by those engaged in the mining business in this state from the earliest territorial days on down to the present.

In 3 Lindley on Mines (3rd Ed.), section 859, pp. 2123-2127, it is said:

"There is no class of contracts connected with the mining industry more familiar to the profession than that of options to purchase, working bonds, or executory contracts of sale. Unlike other classes of real estate, the value of a mine cannot be determined by mere superficial observation. Expensive investigations, involving measurements, examination of underground geological conditions, and sampling invariably precede the consummation of a purchase or sale of mining property. In order to justify an intending purchaser in making the requisite investigations and incurring the attendant expense, he invariably exacts some contract from the owner by which he secures the first privilege of purchasing the property in the event the examination proves satisfactory. In addition to this, a large army of 'promoters,' recruited from the ranks of all professions, trades, and occupations, swarm through the mining regions, seek-

ing exclusive privileges and 'options' on mining properties of all classes for the purpose of marketing them in the moneyed centers of the world. These conditions have given rise to a class of contracts infinite in variety, from a mere letter signed by the owner, agreeing to accept a certain price for his mine if paid within a certain time, to a formidable working bond, which contemplates entry into possession and extensive exploitation to prove the value of the mine before the privilege of purchase must be exercised. The ultimate object of all of them, however, is to secure the exclusive privilege of purchasing at a given price, within a specified time. * * *

"* * * the rule that contracts which do not involve mutuality cannot be specifically enforced is modified in favor of the holder of this class of contracts. He is afforded this equitable remedy, where he fully and fairly performs, or offers to perform, the terms of his contract within the time stipulated.

"The very purpose of an optional contract of this nature is to extinguish this mutuality of right and vest in one of the parties the privilege of determining whether the contract shall be vitalized and enforced. An option to buy or sell land, more than any other form of contract, contemplates a specific performance of its terms; and it is the right to have them specifically enforced that imparts to them their usefulness and value."

Again 3 Lindley on Mines (3rd Ed.), section 861, at pp: 2134-2138, states:

"In a given tract of land it is always a matter of doubt to what extent, if any, mineral may exist in paying quantities, until very considerable development work has been performed, which requires in most instances large expenditure of capital. For this and other reasons not profitable to discuss here, a custom long ago arose for the owner of supposed mineral land to grant to a mine operator the right to enter upon the land and search for and extract mineral, and the form which the contracting parties pretty generally adopted to express their agreement was a 'lease,' which purported to entitle the 'lessee' to occupy such

part of the premises as was necessary to carry on his mining operations, and to 'use' the mine and extract the minerals therefrom. In return for these privileges or rights, the so-called 'lessor' usually reserved 'rent' in the form of a certain sum per ton on all mineral to be produced. This form of contract seemed best adapted to the mutual protection of the parties, in view of the uncertainty of the extent and value of the mineral, and was without doubt considered by them in fact as in name a 'lease.' * * *

"We have already seen that mineral in place is land; that when it is taken therefrom and changed into personal property, real estate has to that extent been destroyed. It is obvious that the normal relation of landlord and tenant does not contemplate destruction of the estate by the tenant, and that such destruction cannot properly be called 'use.' It is equally plain that the so-called 'rent' in a mining lease is something more than a return for the possession and use of real property. While the contract is in name a lease, it amounts in fact to a sale, and if it grant the right to take all the mineral, it is a sale of real estate—the lessee's interest is a fee in the mineral and the lessor's so-called rent is purchase money for real estate.

"Such rents or royalties are principal, and not income, and must be so treated in the ascertainment of the respective interests of life tenants and remaindermen. * * *.

"Although the doctrine that a grant of all the mineral in a described tract of land, whether by deed or so-called lease, conveys an estate in the mineral as land, does not seem to have been specifically passed upon as applicable to a lease of mining property acquired or held under the United States mineral acts, we are constrained to believe that when such questions arise, the general doctrine as herein set forth will be recognized and applied with all its attendant consequences. That doctrine, as we have seen, is based upon the principles that mineral in place is land, that a grant of the right to extract and dispose of it, and thus destroy its character as real estate, amounts to its sale as land,

and that royalties (or so-called rent), payable *per quantum* of the mineral taken, are purchase money and principal, rather than rent and income. As these principles flow from the nature of mineral land as such, we can see no reason why they should not be of equal application to leases of mineral land acquired from any source."

The "Melissa" is an unpatented mining claim requiring the doing of annual labor and proof thereof to protect such claim from relocation by one asserting noncompliance with the statutory provisions governing such mining property.

For a period of 13 years from February 1934, when the property was leased to McLaren, to February 1947, when this suit was commenced, Morton and his successors in interest reaped the benefits and protection resulting from the performance by plaintiff of the requisite annual work on this claim and the filing of proof thereof.

Within five months after the giving of the lease, Robert L. Morton the lessor, commenced suit to quiet title to the mining claim thereby evidencing an intention on his part to comply with the provision of the contract calling for the payment of one-half the stipulated selling price "on or before one year after said Lessor fully clears title to said premises so that he can furnish good and sufficient title clear from all encumbrance or adverse claims."

At no time during the life of the principal, Robert L. Morton, was the power of attorney ever revoked. There is nothing in the record to show that the attorney in fact at any time acted otherwise than for the best interest and advantage of his principal, or that the principal at any time ever questioned the right or authority of his attorney in fact to enter into the lease and option contract or that the principal at any time ever expressed or otherwise made manifest any dissatisfaction with any of the terms, conditions or provisions of the lease and option.

Notwithstanding the fact that the principal lived for some ten months after entering into the contract with McLaren there

is no evidence whatever in the record before us that the principal Morton ever disapproved of any act of his agent, Dan G. Ross.

It is settled that a principal who neglects promptly to disavow an act of his agent, by which the latter has transcended his authority, makes the act his own; he is bound to disavow it the first moment the fact comes to his knowledge.

In Mechem on Agency (2nd Ed.) at page 175, sections 242 and 243, it is said:

"It must also be kept in mind that one method of conferring powers may be by the granting of others to which the former may in some manner be deemed incidental or appurtenant. Thus the authority of the agent is not necessarily to be deemed to be confined to the doing of the main act authorized. Every delegation of power carries with it, by implication, unless the contrary is declared, the authority to do all those incidental acts, naturally and ordinarily done in such a case, which are reasonably necessary and proper to carry into effect the main power so conferred. * * *

"It is also to be assumed, unless the contrary is declared, that the principal intends that the authority shall be executed in accordance with the customs which prevail in transactions of that sort; and the main power will therefore be deemed to include the authority to do all those incidental acts which are customarily done by such an agent at that time and place, unless the contrary is made known to the persons with whom the agent deals."

The powers expressly granted "to * * * sell or dispose of * * * lease, * * * or otherwise transfer any and all of said mines" and the express restatement of such powers "to locate * * * mining claims * * * and * * * to * * * sell * * * lease or otherwise dispose of any and all of them to our best advantage" clearly and sufficiently authorized the attorney in fact to enter into the usual and customary lease with option to purchase contract for and on behalf and in the name of his principal and we so hold.

The judgment is reversed and the cause is remanded to the district court with directions to strike the court's conclusion of law designated as No. II; to disallow the objections to the introduction in evidence of defendants' exhibits A, B, C and D and to enter judgment for plaintiff and against defendants for the relief as prayed for in plaintiff's complaint.

ASSOCIATE JUSTICES FREEBOURN, ANGSTMAN, METCALF and BOTTOMLY, concur.

On Petition for Rehearing

MR. CHIEF JUSTICE ADAIR:

Inasmuch as the words "dispose of" are twice used in the power of attorney in the same sentence and in the same connection,—first following the word "sell" and preceding the word "lease," and next following the words "sell, mortgage, lease," it is evident that the words "dispose of" and the words "sell" and "lease" are not synonymous, and the only conclusion therefrom is that the words "dispose of" must be interpreted in a broader sense. Compare In re Sattes' Estate, 59 Mont. 220, 222, 195 Pac. 1033.

The word "dispose" has a larger meaning than "sell;" selling being only one of the methods of disposing of property. Munday v. Britton, 205 Mo. App. 153, 222 S. W. 504, 506. Compare Rider v. Cooney, 94 Mont. 295, 308, 23 Pac. (2d) 261; Hill v. Sumner, 132 U. S. 118, 10 S. Ct. 42, 33 L. Ed. 284.

As said by the Supreme Court of the United States in Phelps v. Harris, 101 U. S. 370, 380, 25 L. Ed. 855: "The expression 'to dispose of' is very broad, and signifies more than 'to sell'."

In American Home Missionary Society v. Wadhams, 10 Barb., N. Y., 597, the word "dispose" was declared to be "sufficiently comprehensive, in its meaning, to include every possible mode of alienation, or disposition of property." Also see State ex rel. Cross v. Board of Land Commissioners, 50 Wyo. 181, 58 Pac. (2d) 423, rehearing denied 62 Pac. (2d) 516, 517.

In People v. Sidwell, 27 Cal. (2d) 121, 162 Pac. (2d) 913, 916, the defendants Sidwell and Davis delivered to one Moore a con-

398

tract in writing whereby they agreed to set aside for Moore, 5 per cent of all the production of a prospective oil well in consideration of a loan of $5,000 by Moore for which defendants gave their promissory note for 90 days at 6 per cent and on the completion of the well to apply for a permit to transfer such interest. In holding that by such transaction the stipulated per cent of production was "disposed of" the court said: " 'Dispose of' means, among other things, 'to fix the condition, employment, etc., of; to direct or assign for a use' and also 'To transfer to the control of someone else, as by selling; to alienate; part with; relinquish; bargain away.' (Webster's New Int. Dict., 2d ed.) It is apparent that the 5 per cent interest in production of the well was assigned to a specified use by the agreement. It was not transferred to the immediate control of Moore, but it was bargained away; i. e., for an entire consideration of $5,000 the defendants issued their promissory note and agreed that the per cent, if it was ever transferred to any one, was to be transferred to Moore.''

So in the instant case while the clause in the agreement granting lessee the right to purchase the demised mining property did not effect an immediate transfer of the title to the lessee yet it evidences a bargain made that if, within the time and in the manner provided, the lessee should elect to pay the stipulated consideration of $4,000, the title to the mining claim would be transferred to him.

The express authority granted to Ross "to * * * sell or dispose of * * * lease * * * or otherwise transfer" the demised property clothed him with ample power to bargain away and execute the lease and option agreement which is a valid and binding contract the performance whereof may be decreed and compelled in this action. The petition for rehearing is denied and remittitur will issue forthwith.

MR. JUSTICES ANGSTMAN, METCALF and BOTTOMLY, concur.

Rehearing denied December 12, 1950.