FILED

09/22/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0525

DA 19-0525

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 240

IN THE MATTER OF THE ESTATE OF:

DANIEL COOK,

     Deceased.

APPEAL FROM:     District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DP-16-107
Honorable Karen S. Townsend, Presiding Judge

COUNSEL OF RECORD:

     For Appellants:

          Robert A. Terrazas, Dana A. Henkel, Terrazas Henkel, P.C.,
Missoula, Montana

     For Appellee:

          Donald V. Snavely, Snavely Law Firm, Missoula, Montana

Submitted on Briefs:  June 10, 2020

Decided:  September 22, 2020

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1     The Cook family appeals following a District Court Order that Dan Cook's Last Will and Testament be confirmed and admitted to probate and that Kim Smith be appointed personal representative of the estate. We affirm.

¶2     We restate the issues on appeal as follows:

*Issue One: Whether Kim Smith exceeded her authority under a general Power of Attorney granted to her by Dan Cook.*

*Issue Two: Whether Dan Cook had the requisite capacity to enter into a valid marriage with Kim Smith shortly before his death.*

*Issue Three: Whether Dan Cook had the requisite capacity and intent to create and amend a valid will.*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3     Kim and Dan met as teenagers in Missoula and dated throughout most of high school.  After high school, Dan moved to Billings and operated a heating and air conditioning business.  Kim married and moved to Tennessee with her husband.  Kim and Dan stayed in touch and resumed their relationship in 1999.  In October 2000, Dan closed his business and moved to Tennessee.  In 2001 Dan and Kim moved to Missoula.

¶4     Kim and Dan maintained a relationship from 1999 until his death in 2016.  They occasionally discussed marriage but did not co-mingle assets.  They shared living expenses but did not closely track these transactions.  Kim and Dan maintained separate bank accounts and did not own real property together.  Dan actively managed his own assets and did not name Kim as a beneficiary on his financial accounts.

¶5    In January 2016 after a colonoscopy and subsequent biopsy, Dan was diagnosed with cancer. Kim testified that after they learned Dan had cancer, they began discussions about end-of-life issues and trusts and wills. On February 17, 2016, after receiving a PET scan, Dan learned that his disease was incurable, with a life expectancy of between two weeks and two months. Dan purportedly began talking more about end-of-life issues. He did not have a will or trust.

¶6    As of February 23, 2016, Dan's assets included a First Security Bank checking account naming his father, Wilfred Cook, as the pay-on-death beneficiary; a Money Market Savings Account naming his father, his mother, Bernice Cook, and his brother, Terry Cook, as pay-on-death beneficiaries; a Montana Medical Savings Account naming no beneficiaries; a Health Savings Account; a MetLife Annuity; an SG Long Individual Investment account (RBC) naming his father as beneficiary; an Allianz Variable Annuity; and a TD Ameritrade Investment Account. Dan's father died in 2015, approximately one year prior to Dan's death. Dan's accounts had not been updated with alternate beneficiaries at the time Dan was diagnosed with cancer.

¶7    In February 2016, Kim began preparing a power of attorney (POA), a will, and a trust for Dan. Kim, who is not licensed to practice law but worked in the finance industry, prepared the will using her own will, her mother's will and trust documents, and templates found online. Kim testified at trial that she and Dan discussed the documents while she worked on them. Kim testified they intended to review the documents with an attorney but "ran out of time."

¶8     On February 22, 2016, Dan signed transfer paperwork to move his TD Ameritrade account to his individual account at SG Long.  On February 23, 2016, Dan went to his first chemotherapy appointment.  Lab results indicated he should be admitted to the hospital for further evaluation.  Dr. Kolendich was asked to consult with Dan.  Dr. Kolendich reported that Dan was pleasant, alert, oriented, and answered all questions appropriately.  However, after meeting with two other doctors, Dr. Scott and Dr. Seagraves, Dan forwent chemotherapy on that day because he was too sick.  Dr. Scott noted that Dan had realistic expectations regarding his prognosis and was preparing for the end of life.

¶9     Dan's medical records from the evening of February 23 indicated that Dan was not confused, disoriented, or demonstrating memory loss at that time.  Dan was communicating without difficulty, was awake, alert, and oriented to person, place, and time.  Dan's medical records on February 24 reflected that his status remained within defined limits.  At 8:20 a.m., Dr. Scott wrote that, while Dan had had a difficult night due to persistent eructation and abdominal distention, his pain was well controlled, he was emotionally stable, accepted his poor prognosis, and was anxious to complete paperwork in anticipation of the end of life.  Dan was provided a nasogastric (NG) tube to help with abdominal distention and burping.  Entries in his medical records from between noon and 3:27 p.m. reflect that his speech was clear and coherent, that he was encouraged to walk, and that he used the toilet and brushed his teeth.

¶10    On February 24 between 3:30 and 4:30 p.m., Dan signed a "Durable General Power of Attorney of Daniel E. Cook," the "Last Will and Testament of Daniel E. Cook," and "The Daniel E. Cook Revocable Living Trust dated February 24, 2016."  Dan's Will was

4

a "pour over" will, putting everything in the Trust upon Dan's death. Kim was named the personal representative. Dan's Will was not signed by two witnesses. Dan was named as the Primary Trustee during his lifetime while competent. Upon his death or incapacity, Kim was named as the trustee. The Trust named Bernice, Kim, Terry, and James (Dan's other brother) as beneficiaries. Bernice was to receive $3,000 monthly to allow her to live in reasonable comfort in her home until her death or permanent departure from her home. Jim was to receive $50,000. Terry was to receive $250,000. Kim was to receive $300,000 plus monthly dividends and interest earned by the Trust at her discretion. The Trust was to terminate after all payments had been made—upon Bernice's death or permanent vacation of her home.

¶11     Kim and her sister, Michelle Barthelmess, were present when Dan signed the Will, Trust, and POA on February 24 around 3:30 p.m. Kim testified at trial that she checked at the hospital for a notary but none were available, so she called Michelle. Michelle, a notary public, notarized the documents, but she did not assist in or create any of the documents. Dan was purportedly "pushing hard" to complete the documents. Michelle testified Dan was upright in bed and Kim took each document, showed it to Dan, and described what it was. She and Dan discussed the Trust before he signed it. Dan signed one document at a time, Michelle notarized the signature, and then they moved to the next document, signing the POA, Will, and the Trust. Kim testified Dan was in a serious mood and that he was not confused and knew what he was signing. Michelle testified that she stayed until around 5:00 p.m. and that Dan was talkative, conversing normally, and seemed alert. Michelle was not concerned that Dan did not understand what was going on or that he was delusional

5

or confused. Michelle also said Kim was not putting pressure on Dan to sign documents, and if anything, Dan was pressuring Kim to get things done. Michelle testified that she did not perform a "mini-mental exam" on Dan before she notarized the documents he signed. She was not aware of his symptoms and did not ask him what medications he had been taking before notarizing the documents.

¶12 Terry, Dan's brother, testified at trial that he also visited Dan in the hospital on February 24 for an hour to an hour and a half. Terry testified Dan was confused, speaking slowly, had to concentrate on what he was saying, looked jaundiced, was spitting bile in a cup, and acted medicated. His trial testimony was inconsistent with his deposition testimony, in which he had testified that Dan did not seem confused, that he seemed like he was comprehending things normally, and that he understood what he was doing when he discussed his estate plan with Terry. Terry testified at trial that he believed his deposition testimony was inaccurate because he had been confused about what day he talked to Dan and on what day Dan had signed the Trust. The trial court found that, because Terry did not testify consistently about Dan's mental status on February 24 and did not offer a credible explanation for the inconsistency, Terry's statements could not be reconciled and disregarded his testimony as to Dan's capacity on February 24.

¶13 Subsequently, Dan purportedly instructed Kim to move $30,000 into her checking account so she could buy a 4-wheel drive vehicle. Dan also instructed Kim to transfer several pickup trucks he owned into her name. Bernice, Dan's mother, testified that she visited Dan on February 25, that Dan handed her an envelope with $20,000 in it and told her to "[t]ake this." Bernice testified Dan was coherent and did not act confused when he

6

gave her the cash. Dan's medical notes on February 25 indicated Dan was alert and oriented and able to understand and communicate without difficulty.

¶14    Kim testified that on February 26, Dan instructed her to change the beneficiary on his two bank accounts at First Security Bank to the Trust before the weekend. She signed a check using her POA to deposit $150,051.12 from one bank account into his RBC account. Dan continued to stabilize and improve on February 27 and 28. On February 29, Dan quitclaimed property he owned in Florence, Montana, to Kim. Michelle notarized the quitclaim deed. She did not ask Kim to leave the room before notarizing the document or speak to Dan alone or ask what medications he was taking. Dan's medical records for February 29 reflect that he continued to understand and communicate without difficulty.

¶15    On March 1, Dan had a reaction to Ativan and expressed symptoms of confusion. Dan was discharged later that day for home with hospice care. Kim testified that while Dan was hospitalized, he knew who his family was, understood the nature of his assets, and was not confused about these matters. Kim also testified that she did not tell Dan what to do with his assets and he made all such decisions himself. Dan's medical records reflect that his mental faculties were routinely documented that health care providers did not indicate that Dan was incapable of end-of-life planning.

¶16    Friends of Dan testified as to their interactions with Dan at the hospital and after he was sent home. Dan's friend Larry Connell, who knew Dan for about 16 years, testified Dan knew what he wanted and was scrambling to get it done, and had loose ends to tie up. He also testified that Dan was hardheaded and not easily influenced. Larry testified that he saw Dan around six or eight times after Dan returned home, that he was not "out of it,"

7

and that he was "real plain on what he wanted" to happen after he passed away. He also said Dan did not suggest that there was any pressure on him, and that "you would have to have a gun to pressure Dan, especially with his finances. That was just Dan." Larry was not aware of what medications Dan was taking.

¶17 Other friends of Dan who had spent time with him during his final days also testified. All testified that Dan was not confused, that he knew who his family was and what he wanted after he passed away, and that he did not appear pressured in any way. Many testified that Dan was not the kind of guy you could push around.

¶18 Michelle testified that, on the evening of March 4, Kim contacted her by email. The email requested that Michelle bring over an amendment to Dan's Trust as soon as possible because he was "really worried about getting this amendment done" and signed. Michelle printed the document on the morning of March 5, brought it to the house, and Dan signed the amendment to the Trust. The amendment affected Terry's distribution. Rather than receiving a distribution of $250,000 upon Dan's death, Terry was to receive $50,000 outright and the remaining $200,000 only if he sold or closed his business within 18 months of Dan's death. Michelle testified Dan was not drowsy or confused. He signed the Trust Amendment and she notarized it. Dan explained to her what it was and understood it was an amendment to the original Trust. She did not have any concern that he did not know what he was signing.

¶19 Later on March 5, Kim, Bernice, and Jim were present at a meeting where Dan discussed his wishes. Bernice testified Dan could not really converse, did not look alert, and did not know what was going on. On March 6, Terry came over. Kim testified Dan

8

was not confused and was engaged with Terry. Terry and Dan got in an argument. Terry testified that Dan was "out of it," and not able to communicate well. Kim explained the trust to Terry. According to Terry, Dan was not participating in the discussion. On March 6, Dan Asked Kim to marry him. Kim testified she and Dan had been talking about getting married for a few days. That afternoon, Mike, Dan's best friend, came over. He testified that Dan was not confused, was talkative and coherent. Dan told Mike he wanted to marry Kim, and they discussed things he wanted Mike to have when he passed away. Larry Connell testified he saw Dan on March 6 as well and he did not show any signs of confusion.

¶20 Also on March 6, Pastor John Daniels met with Dan and Kim at their home. He talked to Dan about the marriage. He testified Dan was cognizant and aware his death was impending. Arrangements were made for Pastor Daniels to come again in a day or two to perform the marriage ceremony. On March 7, Kim obtained a marriage license and application. Dan signed the application and Michelle notarized it. Mike testified he saw Dan sign the license application and that Dan was not pressured to sign it.

¶21 Shirley Faust, the Missoula County Clerk of Court, testified the marriage license was issued on March 7. She testified that both parties do not need to be present before the clerk of court to apply for a marriage license. She also testified that clerks ask the appearing applicant if they are under the influence of intoxicating liquor or narcotic drugs. If one party does not appear, the non-appearing party attests to the answers typed on the application. She testified that from her perspective, being under the influence would mean some kind of impairment as a result of drugs or alcohol.

9

¶22 Pastor Daniels returned to the house on March 7. Though Dan was initially not alert or awake enough to participate in the ceremony, after a short amount of time, Dan awoke and Pastor Daniels testified that after talking to Dan, he felt Dan had the mental capacity to enter into a marriage. Pastor Daniels performed a wedding ceremony that required a formal inquiry and a response of affirmation or declination. Dan responded to the questions, but Pastor Daniels did not recall whether he verbally answered or gestured. Pastor Daniels testified "My sense was clearly he was saying yes." He also testified that if he had seen indications Dan was confused or not of sound mind, he would not have married Dan and Kim. Mike testified he was at the wedding and observed that while Dan's responses were short, they indicated agreement and he fully understood what was going on and wanted to participate.

¶23 On March 8, Dan passed away. Bernice was present in the morning and said Dan did not know her and he was having a bad time. Following Dan's death, Terry filed a Petition for Formal Probate of Will and Appointment of Personal Representative. Terry disputed the validity of the marriage on the grounds that Dan lacked the mental capacity to enter into a marriage. Terry disputed the validity of the Will, Trust Agreement, and the revised Trust Agreement on the grounds of lack of capacity. Terry alleged that Dan's medical treatments rendered him cognitively insufficient to enter into a testamentary disposition. Terry asserted he was entitled to be appointed as personal representative of Dan's estate and letters should be issued to him. Kim filed a cross-petition for her appointment as personal representative. Kim alleged that under the Last Will and Testament, all Dan's assets are devised to the "Daniel E. Cook Revocable Trust" dated

February 24, 2016. Kim alleged she was Dan's surviving spouse and named personal representative in Dan's Will. She argued the Will was valid and asked that it be admitted to probate and that the Court declare the Trust and its subsequent amendment to be a valid and enforceable inter vivos trust.

¶24 The Fourth Judicial District Court held a non-jury trial on the matter. At trial, Dr. Eric Kress, a family physician in Missoula, testified on behalf of the Cooks.[1] Dr. Kress had not treated Dan but was asked for an opinion based on the medical records he reviewed. Dr. Kress estimated that Dan's illness would make it difficult to make complicated medical decisions and likely would have made Dan susceptible to undue influence. He also testified that the medications Dan was given can cause confusion, disorientation, sleepiness, and susceptibility to undue influence. In Dr. Kress's opinion, the notations "oriented times 4" in Dan's medical records were likely the result of clicking a checkbox in a computerized documentation form, which he did not view as persuasive evidence that the assessment had actually been properly carried out. However, he agreed that Dan's mental status was not tested conclusively and that there was material in the medical records that could support a finding of Dan's competency. He also added that people in an end stage of life could go in and out of mental lucidity. He agreed that relevant information about Dan's mental status could be provided by friends and family who saw Dan while he was in the hospital and in hospice.

---

[1] On August 2, 2017, the parties stipulated to joining Dan's mother, Bernice Cook, and Dan's brother, James Cook, as parties (Cooks).

11

¶25 Dr. William Stratford, a medical doctor in private practice in Montana, testified on behalf of Kim. He did not treat Dan. In reviewing Dan's medical records, he testified Dan did not undergo a formal competency determination. In his opinion, Dan was competent to execute a will and trust on February 24 because he understood "the nature and quality of his bounty and where he wanted it to go." He also believed Dan was competent and had the capacity to understand his assets and where he wanted them distributed on March 5, when he signed the Trust Amendment. He testified regarding Dan's capacity on March 7, around the time of the wedding. Based on his interviews of Pastor Daniels and persons at the wedding, Dr. Stratford believed that Dan knew "what he was doing, which was getting married. That was his intent." Dr. Stratford also testified that Dan's medications were prescribed at a reasonable, normal dose and not expected to change his mental status, particularly on the days of February 24, March 5, or March 7.

¶26 On July 8, 2019, the District Court issued a Findings of Fact, Conclusions of Law and Order. The District Court held that Dan was competent to give Kim POA on February 24, 2016, and Kim did not exceed the authority of the POA; that Dan had testamentary capacity at the time he signed his Will, Trust, and Trust Amendment; that Dan's Will was not formally witnessed, but that there was clear and convincing evidence Dan intended the document to constitute his Will; that Dan was not subjected to specific acts of undue influence; and that Dan consented to marriage on March 7. The court ordered that Dan's Last Will and Testament be confirmed and admitted to probate, and Kim be appointed personal representative of Dan's estate. Cooks appeal.

# STANDARDS OF REVIEW

¶27 This Court reviews findings of fact in a bench trial in a civil action to determine whether they are supported by substantial credible evidence. *DeNiro v. Gasvoda*, 1999 MT 129, ¶ 9, 294 Mont. 478, 982 P.2d 1002. This evidence is viewed in the light most favorable to the prevailing party. *DeNiro*, ¶ 9. The credibility of witnesses and weight assigned to their testimony is left to the determination of the district court and will not be disturbed on appeal. *Barrus v. Mont. First Judicial Dist. Court*, 2020 MT 14, ¶ 13, 398 Mont. 353, 456 P.3d 577. This Court reviews a district court's conclusions of law to determine whether they are correct. *DeNiro*, ¶ 9. Mixed questions of law and fact, including the district court's application of controlling legal principles to its factual findings, are reviewed de novo. *Barrus*, ¶ 15.

# DISCUSSION

¶28 *Issue One: Whether Kim Smith exceeded her authority under a general Power of Attorney granted to her by Dan Cook.*

¶29 Cooks argue the District Court impermissibly ratified Kim's POA without addressing well-established Montana law prohibiting agents from using POAs for personal benefit unless expressly prescribed. Cooks claim that Dan signed a POA naming Kim the agent under a "general grant," but did not provide Kim the authority to transfer Dan's assets for her benefit while Dan lived or appeared competent. Cooks maintain that the court ignored Kim's alleged self-dealing, claiming she improperly used Dan's POA for her benefit by creating and issuing a check for $150,051 from Dan's checking account and then depositing it into Dan's SG Long Individual account, which she managed and of which she

was the primary beneficiary. Kim also used the POA when signing a letter for wire transfer of $30,000 from Dan's SG Long account to her individual account. They argue that the POA does not allow Kim to personally benefit from its use.

¶30 Section 72-31-336, MCA, provides:

(1) An agent under a power of attorney may do the following on behalf of the principal or with the principal's property only if the power of attorney expressly grants the agent the authority and exercise of the authority is not otherwise prohibited by another agreement or instrument to which the authority or property is subject:
(a) create, amend, revoke, or terminate an inter vivos trust;
(b) make a gift;
(c) create or change rights of survivorship;
(d) create or change a beneficiary designation;
(e) delegate authority granted under the power of attorney;
(f) waive the principal's right to be a beneficiary of a joint and survivor annuity, including a survivor benefit under a retirement plan;
(g) exercise fiduciary powers that the principal has authority to delegate; or
(h) disclaim property, including a power of appointment.

¶31 Powers of attorney generally are construed by the rules governing the interpretation of written instruments. *McLaren Gold Mines Co. v. Morton*, 124 Mont. 382, 390, 224 P.2d 975, 979 (1950). These rules require that, when possible, the parties' intent with regard to the authority granted be ascertained from the writing alone. *McLaren Gold Mines*, 124 Mont. at 390, 224 P.2d at 979. In doing so, "[t]he words used in the writing are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." *McLaren Gold Mines*, 124 Mont. at 390, 224 P.2d at 979. In addition, "where power is conferred on an agent by a power of attorney, the meaning of general words in the instrument is restricted by the

14

context and construed accordingly and the authority given is construed strictly, so as to exclude the exercise of any power that is not warranted either by the terms actually used or as a necessary means of executing with effect the authority given." 3 Am. Jur. 2d *Agency* § 27 (2013); *see also In re Nix's Estate*, 66 Mont. 559, 565-66, 213 P. 1089, 1091 (1923) (citations omitted).

¶32 The POA did not prohibit or limit the authority of Kim. Instead, the POA states in relevant part:

> My agent(s) has the power to exercise or perform any act, power, duty, right, or obligation for whatever that I now have or may hereafter acquire relating to *any* person, matter, [or] transaction . . . . I grant to my agent full power and authority to do everything necessary in exercising any of the powers herein granted as fully as I might do if personally present . . . hereby ratifying and confirming all that my agent shall lawfully do or cause to be done by virtue of this power of attorney and the powers granted herein.

(Emphasis added.)

¶33 Accordingly, § 72-31-336(3) and (4), MCA, also apply:

> (3) Subject to subsections (1), (2), (4), and (5), if a power of attorney grants to an agent authority to do all acts that a principal could do, the agent has the general authority described in 72-31-339 through 72-31-351.
> (4) Unless the power of attorney otherwise provides, a grant of authority to make a gift is subject to 72-31-352.

¶34 Section 72-31-352, MCA, provides in part that "[a]n agent may make a gift of the principal's property only as the agent determines is consistent with the principal's objectives if actually known by the agent[.]"

¶35 The express language of the POA specifically authorized Kim to exercise any power which Dan possessed, relating to "any person." Kim's transfer of approximately $150,000 to Dan's RBC account was made in Dan's name and did not specifically benefit Kim. The

15

check was deposited in Dan's RBC account, which he controlled. Kim did not directly benefit from this transfer. The $30,000 transfer from First Security Bank to Kim's personal account, however, did benefit Kim. Dan approved of this transfer, a gift which he authorized. The POA does not prohibit her personal benefit from its use, and further, Kim testified that she always first received authorization from Dan prior to conducting any transfers. [2] The District Court did not err in finding that Kim did not abuse her powers under the POA document.

¶36    *Issue Two: Whether Dan Cook had the requisite capacity to enter into a valid marriage with Kim Smith shortly before his death.*

¶37    Cooks argue that the District Court erred in concluding that Kim and Dan entered into valid marriage, claiming Dan did not possess the requisite capacity to enter into the marriage because he was intoxicated by prescription drugs at the time.

¶38    Section 40-1-402(1)(a), MCA, provides that:

> The district court shall enter its decree declaring the invalidity of a marriage entered into under the following circumstances:
>     (a) A party lacked capacity to consent to the marriage at the time that the marriage was entered into, either because of mental incapacity or infirmity or because of the influence of alcohol, drugs, or other incapacitating substances, or a party was induced to enter into a marriage by force or duress or by fraud involving the essentials of marriage[.]

¶39    However, § 40-1-402(2), MCA, goes on to provide that "[a] declaration of invalidity under subsections (1)(a) through (1)(c) may be sought by any of the following persons and

---

[2] Cooks argue that evidence regarding Dan's wishes are inadmissible hearsay. However, Cooks did not object at trial to Kim's testimony that she "always got authorization" from Dan when handling the First Security Bank transfer.

must be commenced within the times specified, but a declaration of invalidity *may not be sought after the death of either party to the marriage*[.]" (Emphasis added.)

¶40 Here, Terry did not challenge the validity of the marriage until June 14, 2016, when he filed his Petition for Formal Probate of Will and Appointment of Personal Representative. Dan died March 8, 2016. The Cooks argue that applying this subsection would be against public policy interests in strengthening and preserving the integrity of marriage. We interpret a statute according to the plain meaning of the words used. *See* § 1-2-102, MCA; *State v. Incashola*, 1998 MT 184, ¶ 11, 289 Mont. 399, 961 P.2d 745. The District Court correctly applied the bar on challenging a marriage posthumously.[3]

¶41 *Issue Three: Whether Dan Cook had the requisite capacity and intent to create and amend a valid will.*

¶42 Finally, Cooks challenge the validity of the Will, claiming that the Will was not duly executed, that Dan lacked capacity, and that Kim had the burden to overcome the presumption that Dan lacked capacity with clear and convincing evidence such that the District Court did not correctly apply Montana law. Cooks argue that the District Court

---

[3] Even if the bar did not apply, Cooks' argument that Dan did not have the capacity to enter the marriage is undermined by the evidence in the record. A number of people, including Pastor Daniels, testified as to interactions with Dan immediately prior to and during the marriage ceremony and all indicated that Dan understood what was happening and that he possessed the requisite intent. Further, while Cooks assert Dan was heavily medicated with narcotics, the record reflects that he received only a 1 mg dose of Dilaudid more than six hours prior to signing the marriage application and, at intervals earlier in the day, two doses of Lorazepam (Ativan) which Dr. Stratford testified is not a narcotic and, based on when Dan took the medication, would not have affected Dan's mental capacity at the time of the ceremony. In considering whether a party lacked the capacity to consent, a petitioner must offer clear and definite evidence that one of the spouses lacked "sufficient mental capacity to understand intelligently the marriage contract . . . and the obligations it imposed upon him." *In re Marriage of Helsel*, 223 Mont. 85, 87, 723 P.2d 963, 964 (1986). Cooks failed to meet this burden.

improperly shifted the burden to them to prove that Dan lacked the capacity or intent to execute the Will.

¶43    A will must be: (1) in writing; (2) signed by the testator or in the testator's name by some other individual in the testator's conscious presence and by the testator's direction; and (3) signed by at least two individuals. Section 72-2-522, MCA.

¶44    Generally, a testator enjoys a presumption of mental competence in situations in which a duly executed will is admitted to probate pursuant to § 72-2-522, MCA. *See In re Estate of Brooks*, 279 Mont. 516, 522, 927 P.2d 1024, 1027 (1996). Upon admission of a duly executed will, § 72-3-310, MCA, provides that "[c]ontestants of a will have the burden of establishing lack of testamentary intent or capacity, undue influence, fraud, duress, mistake, or revocation."

¶45    However, even if a will does not satisfy the three required elements, § 72-2-523, MCA, provides:

> Although a document or writing added upon a document was not executed in compliance with 72-2-522, the document or writing is treated as if it had been executed in compliance with that section if the proponent of the document or writing establishes by clear and convincing evidence that the decedent intended the document or writing to constitute:
>     (1) the decedent's will;
>     (2) a partial or complete revocation of the will;
>     (3) an addition to or an alteration of the will; or
>     (4) a partial or complete revival of the decedent's formerly revoked will
> or of a formerly revoked portion of the will.

¶46    Here, § 523 applies because the Will was not signed or witnessed by two individuals. This Court has held that "no presumption that the decedent was competent to execute a will

exists where § 72-2-523, MCA, applies." *Brooks*, 279 Mont. at 523, 927 P.2d at 1028. The burden to prove capacity shifts to the proponent of the will.

¶47 Cooks rely on *Brooks*, arguing that proponents of this Will, which was not duly executed, bear the burden of proving by clear and convincing evidence that Dan intended the document to constitute his Will. They argue that the District Court improperly shifted the burden to the Cooks to prove Dan lacked capacity to execute the will.

¶48 Indeed, the District Court found that "[c]ontestants of a will have the burden of establishing lack of testamentary intent or capacity, undue influence, fraud, duress, mistake or revocation," and that "the presumption is that the donor was competent and of sound mind and undue influence or incompetence must be proven like any other fact." The District Court also held that "Terry has not carried his burden of proof as to undue influence, lack of testamentary capacity, invalidity of marriage or other grounds for invalidating Dan's Will." The District Court failed to recognize that the burden to prove a lack of testamentary intent or capacity shifts when § 72-2-523, MCA, applies.

¶49 The District Court mistakenly applied this burden and the Cooks argue that this improper burden shifting constitutes reversible error. However, we conclude that the court's incorrect interpretation does not require reversal of this case. The evidence put forth at trial—including the testimony of Kim, her sister Michelle, Dr. Stratford, and witnesses who visited Dan, describing him as alert, coherent, and understanding what was going on—was sufficient to allow Kim to carry her evidentiary burden of showing that Dan possessed the requisite mental capacity to enter into the Will, both when he first executed his Will on February 24 and when he amended his Will on March 5. Cooks' only evidence

to the contrary is the testimony of Dr. Kress, who did not meet with Dan at any time or interview those who had, and Terry's testimony, which the District Court found unreliable due to its conflict with his deposition testimony. Any error by the District Court was harmless.

## CONCLUSION

¶50 The District Court did not err in concluding that Kim did not exceed her POA when she transferred Dan's money. Neither did it err in finding that Dan was competent to marry Kim Though the District Court erred in applying the incorrect burden of proof to determine the validity of Dan's Will, that error was harmless here as the District Court's findings of fact were sufficient, under the correct burden of proof, to support its conclusion that Dan was competent to create and amend his Will on the dates in question. For these reasons, we uphold the District Court's order that Dan's Last Will and Testament be confirmed and admitted to probate and that Kim be appointed Personal Representative of the estate.

¶51 Affirmed.

/S/ MIKE McGRATH

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR